Gary S. Lincenberg - State Bar No. 123058
    glincenberg@birdmarella.com
Naeun Rim - State Bar No. 263558
    nrim@birdmarella.com
Kate S. Shin - State Bar No. 279867
    kshin@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant
Guia Cabactulan

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| United States of America, | CASE NO. 2:20-cr-00079-TJH |
|---|---|
| Plaintiff, | **DEFENDANT GUIA CABACTULAN'S NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT** |
| vs. | |
| GUIA CABACTULAN, MARISSA BUENAS and AMANDA ESTOPARE, | [Filed concurrently with the Declarations of Naeun Rim, Kate S. Shin, and Fernando Jun Taguiang, and Notices of Lodging] |
| Defendants. | |
| | Date:    October 19, 2020 |
| | Time:    10:00 a.m. |
| | Crtrm.:  9B |
| | Assigned to Hon. Terry J. Hatter, Jr |

3667873

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on October 19, 2020 at 10:00 a.m., or soon thereafter as counsel may be heard in the courtroom of the Honorable Terry J. Hatter, defendant Guia Cabactulan, through her counsel, will move this Court pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure and the Fifth and Sixth Amendments of the United States Constitution, to suppress the statements alleged to have been made on or about January 29, 2020 on the grounds that they were taken in violation of *Miranda* and were involuntary.

Defendant's motion is based upon the accompanying statement of facts and memorandum of points and authorities, the attached declarations of Kate S. Shin and Fernando Jun Taguiang, the accompanying notices of lodging, this Court's file, and any and all other materials that may come to this Court's attention at or before the hearing on this motion.

DATED:  September 21, 2020          Gary S. Lincenberg
                                    Naeun Rim
                                    Kate S. Shin
                                    Bird, Marella, Boxer, Wolpert, Nessim,
                                    Drooks, Lincenberg & Rhow, P.C.


                                    By:  _____/s/ Nauen Rim_____
                                              Naeun Rim
                                    Attorneys for Defendant Guia Cabactulan

3667873

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................5

II.     STATEMENT OF FACTS ....................................................................7

        A.      Ms. Cabactulan's Medical Conditions......................................7

        B.      The Van Nuys Compound.........................................................8

        C.      The January 29, 2020 Raid .......................................................8

        D.      The Unlawful Waiver...............................................................10

        E.      Involuntary Statements ...........................................................13

III.    ARGUMENT .......................................................................................15

        A.      Ms. Cabactulan's Statement Should Be Suppressed Because They Were Obtained In Violation Of *Miranda*. ...................15

                1.      The Alleged Waiver, Given *After* Ms. Cabactulan Invoked Her Right To Counsel. Is Invalid As A Matter Of Law. ............15

                2.      Ms. Cabactulan's Alleged Waiver Of Her *Miranda* Rights Was Not Voluntary Or Knowing................................................16

        B.      This Court Should Suppress Ms. Cabactulan's Statements On The Independent Basis That They Were Involuntary..........................19

                1.      The Government Bears The Burden To Show Ms. Cabactulan's Statements Were Voluntary................................19

                2.      The Totality of The Circumstances Plainly Shows Ms. Cabactulan's Statements Were Involuntary. ...............................19

IV.     CONCLUSION ...................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Blackburn v. Alabama*,
    361 U.S. 199 (1960) ...................................................................................................19

*Collazo v. Estelle*,
    940 F.2d 411 (9th Cir. 1991) ..........................................................................16, 18, 19

*DeWeaver v. Runnels*,
    556 F.3d 995 (9th Cir. 2009) .....................................................................................19

*Doody v. Ryan*,
    649 F.3d 986 (9th Cir. 2011) .....................................................................................20

*Edwards v. Arizona*,
    451 U.S. 477 (1981) ..............................................................................................15, 16

*Greenwald v. Wisconsin*,
    390 U.S. 519 (1968) ...................................................................................................19

*Jackson v. Denno*,
    378 U.S. 368 (1964) ...................................................................................................20

*Lego v. Twomey*,
    404 U.S. 477 (1972) ...................................................................................................19

*Martinez v. Cate*,
    903 F.3d 982 (9th Cir. 2018) .....................................................................................16

*Michigan v. Harvey*,
    494 U.S. 344 (1990) ..............................................................................................15, 16

*Mincey v. Arizona*,
    437 U.S. 385 (1978) ...................................................................................................17

*Miranda v. Arizona*,
    384 U.S. 436 (1966) ..........................................................................................*passim*

*Montejo v. Louisiana*,
    556 U.S. 778 (2009) ..............................................................................................15, 16

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

*Moran v. Burbine*,
475 US 412 (1986) ......................................................................................18

*Norman v. Ducharme*,
871 F.2d 1483 (9th Cir. 1989) ....................................................................18

*Reck v. Pate*,
367 U.S. 433 (1961) ....................................................................................20

*Schneckloth v. Bustamonte*,
412 U.S. 218 (1973) ....................................................................................19

*United States v. Bautista*,
362 F. 3d 584 (9th Cir. 2004) ......................................................................19

*United States v. Boche-Perez*,
755 F.3d 327 (5th Cir. 2014) ......................................................................20

*United States v. Breton-Rodriguez*,
2006 WL 2228843 (D. Ariz. Aug. 3, 2006), *aff'd*, 232 F. App'x 725
(9th Cir. 2007) ............................................................................................17

*United States v. Breton-Rodriguez*,
232 F. App'x 725 (9th Cir. 2007) ..........................................................17, 18

*United States v. Garibay*,
143 F.3d 534 (9th Cir. 1998) ................................................................16, 17

*United States v. Heldt*,
745 F.2d 1275 (9th Cir. 1984) ....................................................................16

*United States v. Prieto-Villa*,
910 F.2d 601 (9th Cir. 1990) ......................................................................21

*United States v. Tingle*,
658 F.2d 1332 (9th Cir. 1981) ....................................................................19

*Withrow v. Williams*,
507 U.S. 680 (1993) ....................................................................................19

*Young v. Hedgpeth*,
2009 WL 2407946 (C.D. Cal. Aug. 5, 2009) ..............................................20

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

**Rules**

Fed. R. Crim. P. 12 ........................................................................................21

Fed. R. Crim. P. 12(d)...................................................................................21

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

# I.   INTRODUCTION

Guia Cabactulan's answers to the FBI's interrogation on January 29, 2020 must be suppressed because they were taken in violation of her *Miranda* rights. They were also wholly involuntary, as shown by the totality of the circumstances of the FBI's search and interrogation that day.

Ms. Cabactulan is a 60-year-old woman with serious health issues. She suffers from chronic medical conditions including rheumatoid arthritis, asthma, hypothyroidism, hyperlipidemia, vertigo, hypertension, obesity, and other illnesses. She weighs over 220 pounds and is unable to control her bladder, which requires her to wear diapers every day. On January 22, 2020, Ms. Cabactulan received an emergency kidney surgery that left her unable to control her bladder. Just a week later, on January 29, 2020, around eighty FBI agents in full military gear broke down her door, pointed guns at her, and proceeded to interrogate her while she was still suffering from various aftereffects of that surgery and experiencing severe pain.

Ms. Cabactulan's illnesses, pain, and the effects of a recent surgery were clearly visible to and discussed with the FBI agents on January 29, 2020. She repeatedly advised them of her sickness before and during the interrogation. Despite her obvious suffering, the agents subjected her to threats and intimidation. They pointed guns at her even though she could barely stand and needed assistance putting her clothes on.

The interrogation recording plainly shows that at the inception of the interrogation, Ms. Cabactulan requested the presence of a lawyer but the agents deliberately ignored her request. Instead of stopping the interrogation right when she invoked her constitutional rights, as they were required to do under the law, the agents took advantage of her fear and physical impediments and pressured her into involuntarily and unknowingly waiving her *Miranda* rights. The U.S. Supreme Court and the Ninth Circuit have explicitly condemned badgering an accused into waiving previously invoked *Miranda* rights, as the government did here.

The records further reflect that at the time she was asked to sign away her constitutional rights, Ms. Cabactulan was experiencing intense pain and extremely scared and intimidated by the agents. Her medical conditions, pain, nausea, and blurry vision prevented her from fully understanding what they were asking her to sign. After their casual dismissal of her request for counsel, Ms. Cabactulan reasonably believed she could not refuse their demands. She feared the agents would get angry if she did not do what they wanted her to do. Moreover, Ms. Cabactulan was not informed of the fact that there was already a criminal complaint pending against her or the nature of the charges. The agents deliberately withheld such critical information until the end of the interrogation. In her sickness and pain, Ms. Cabactulan could not possibly have fully understood her constitutional rights and what she was giving up by signing the *Miranda* waiver.

Her statements should be suppressed on the independent grounds that they were made involuntarily. Ms. Cabactulan's will was clearly overborn by the intimidation and threats that the agents were exerting over her, along with the illness and pain that she was experiencing throughout the interrogation. As can be heard on the recording, the FBI agents callously refused to stop the interrogation when she asked them to stop because she was in pain, even though she was clearly sick and having difficulty staying alert during the interrogation. Ms. Cabactulan was also denied a restroom break until after the interrogation, which was particularly tormenting to her given her bladder and kidney conditions. When they finally let her use the bathroom, they took away her last remaining dignity by sending a female agent into the bathroom with her while Ms. Cabactulan relieved herself.

The evidence is more than sufficient to show that Ms. Cabactulan's constitutional rights were violated and her statements were coerced. In the event that the government contests this motion, and the Court is inclined to examine further evidence, the Court should hold an evidentiary hearing to resolve any factual disputes.

6
DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

## II.    STATEMENT OF FACTS

### A.    Ms. Cabactulan's Medical Conditions

Ms. Cabactulan is 60 years old. She suffers from numerous and chronic medical conditions, including rheumatoid arthritis, asthma, obesity, hypothyroidism, hyperlipidemia, vertigo, hypertension, high blood pressure, high liver enzymes, and high blood sugar. (Shin Decl. Ex. F [Medical Records of Guia Cabactulan].)[1] She is pre-diabetic and has experienced multiple incidents of kidney stones. (Shin Decl., Ex. A (Unsigned Declaration of Guia Cabactulan (hereafter "Cabactulan Decl.") ¶ 3)).[2] She weighs over 220 lbs. (*Id.* ¶ 3.) She also has an uncontrollable bladder, so she wears diapers. (*Id.*) Due to these serious health issues, She has low immunity and requires regular medications. (*Id.*)

On January 22, 2020, one week prior to her arrest by the FBI, Ms. Cabactulan had an emergency kidney surgery. (Cabactulan Decl. ¶ 4.) That day, she felt severe pain in her lower abdomen and lower back. She was brought to an emergency room at Olive View Hospital. (*Id.*) She was diagnosed with acute kidney infection caused by bladder leakage and staghorn kidney stones. Doctors placed a stent into one of her kidneys. (*Id.*) In the week following her release from the hospital, through and including the day of her interrogation, Ms. Cabactulan was suffering from vomiting, nausea, vertigo, wheezing, and shortness of breath. (*Id.*)

---

[1]    Defense counsel have concurrently filed an unopposed ex parte application to file Exhibit F under seal.

[2]    Because defense counsel has had extreme difficulty accessing Ms. Cabactulan, who is detained at the Metropolitan Detention Center ("MDC"), defense counsel have submitted an unsigned copy of Ms. Cabactulan's declaration as Exhibit A to the Declaration of Kate S. Shin, the contents of which were confirmed with Ms. Cabactulan.  (Shin Decl. ¶ 2.)  Throughout this motion, citations to "Cabactulan Decl." will refer to Exhibit A to Ms. Shin's declaration.  Counsel will file an executed version of Exhibit A prior to the hearing.

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

**B.     The Van Nuys Compound**

Before her arrest, Ms. Cabactulan lived in communal housing for Full Time Miracle Workers ("Miracle Workers") located on the 14400 block of Vanowen Street, Van Nuys, California 91405 (the "Van Nuys Compound"). (Cabactulan Decl. ¶ 2.)  There are about 25 Miracle Workers living in separate living quarters within the Van Nuys Compound. (*Id.*) In addition to their living quarters, the Van Nuys Compound has several one-story structures, including a worship and gathering hall, a kitchen, a mess hall, a cafeteria, and an administrative office. (*Id.*)

Ms. Cabactulan shares a small bedroom with another Miracle Worker. There are two doors to their room. (Cabactulan Decl. ¶ 5.) The first door is in the wall to the right of Ms. Cabactulan's bed, about a foot away from the bottom of her bed. (*Id.*) The second door is in the wall right behind the headboard of her bed. Ms. Cabactulan and her roommate only use the first door because the second door is partially blocked by her bed. (*Id.*; *see also* Taguiang Decl. Ex. I [Ms. Cabactulan's room cleaned up after the raid].)

**C.     The January 29, 2020 Raid**

The FBI's search of the Van Nuys Compound began between 5:30 a.m. and 6:00 a.m. on January 29, 2020. (Cabactulan Decl. ¶ 6.) On the eve of the search, Ms. Cabactulan could not sleep because she was having difficulty breathing and experiencing pain. (*Id.*) In the morning of January 29, 2020 between 5:30 a.m. and 6:00 a.m., Ms. Cabactulan was about to finally fall asleep after the sleepless night when she was frightened by noise and commotion outside her room. (*Id.*) She heard someone breaking down the front door of her living quarters. Then she heard a loud bang from above her head and saw at least five men in full military gear breaking down the door behind the headboard of her bed. (*Id.*) Their violent entrance caused her bed to shake with her on it, and wood from the door to splinter off and fly at her, hitting her in the head. (*Id.*) She was shocked and almost fainted. (*Id.*) The rifles, pointed at her, scared her to death. (*Id.*) More federal agents entered her bedroom

8

through the other door and positioned themselves behind her, sandwiching her between them, all the while pointing their weapons at her. (*Id.*; *see also* Taguiang Decl. Exs. H, I [photos of Ms. Cabactulan's room and of the damaged doors at the compound], Ex. J [snapshots of the video recording taken of the FBI agents].) Photos of the search produced by the Government in discovery show how violently the agents bashed in the door behind Ms. Cabactulan's bed.



Photo of Ms. Cabactulan's bed (on the right), Decl. Shin, Ex. E, p. X.

The agents ordered her to raise both her hands above her head. Ms. Cabactulan responded that she could not because she was sick and might fall if she raised her hands. (Cabactulan Decl. ¶ 7.) She could hardly stand up because she was feeling dizzy and trembling, and she had to support herself up with one hand on a table besides her bed. (*Id.*) Even so, the men demanded that she raise both her hands. She tried to comply but started falling to the floor. Agents grabbed her to keep her on her feet. (*Id.*) The agents told her they were going to take her outside. Ms. Cabactulan was still in her sleepwear. (*Id.*) It was cold outside. It was still dark.

9

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

She was embarrassed. She asked if she could put on her pants. (*Id.*) To her further embarrassment, a male officer helped her to put on her pants because she had no strength to pull the pants up on her own. (*Id.*)

Because she was still trembling and could barely walk, the officers had to help her exit her living quarters. (Cabactulan Decl. ¶ 8.) She told the agents that she could not walk, so one of them brought a chair with wheels for her to sit on. (*Id.*) Then they proceeded to roll her towards the cafeteria so fast that she almost fell. She asked them more than once to please slow down. The agents ignored her plea. (*Id.*)

Ms. Cabactulan was seated, chained, and handcuffed inside the cafeteria. She was in a lot of pain, experiencing shortness of breath and nausea, and visibly sick. (Cabactulan Decl. ¶ 9; Taguiang Decl. ¶ 6.) She was still groggy from the lack of sleep. (Cabactulan Decl. ¶ 9.) She told the agents in the room that she needed rest and her medication. (Taguiang Decl. ¶ 6.) She was freezing because they seated her near the door, blowing in cold air from outside. (Cabactulan Decl. ¶ 9.) She really wanted to urinate and asked for a bathroom break, but the agents refused and told her that she had to wait until she was interviewed. (*Id.*) She was then forced to wait for hours, remain handcuffed and a chain around her upper body. (*Id.* ¶¶ 9; Taguiang Decl. ¶ 5.)

After waiting for several hours, three officers came to Ms. Cabactulan and directed her to stand against a wall for a picture. This made her feel further humiliated. (Cabactulan Decl. ¶ 10.) She wanted to cry but did not out of fear that the armed federal agents might hurt her. (*Id.*) She could not understand why they were treating her this way, breaking down doors and shouting and pointing guns at people in God's house. (*Id.*) Subsequently, the agents took her to the mess hall, where two agents were waiting to interrogate her. (*Id.* ¶ 11.)

### D.     **The Unlawful Waiver**

The FBI's interrogation of Ms. Cabactulan began at approximately 9:20 a.m. and ended at 11:02 a.m. (Shin Decl. Ex. A [transcript of the January 29, 2020

10

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

interrogation] at 2:1-2, 91:12-13.) The interrogation recording unequivocally shows that Ms. Cabactulan twice invoked her right to have counsel at the inception of the interrogation, which was deliberately ignored by the agents:

> MR. RAMSEY: If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time. Do you understand?
> **THE WITNESS: Yeah. I need my lawyer.**
> MR. RAMSEY: You would like to have a lawyer?
> **THE WITNESS: Yeah.**
> MR. RAMSEY: So just to confirm, you would like to have a lawyer before we ask you any questions?
> THE WITNESS: So -- okay. Maybe you can answer that -- if I can answer them, I can.
> MR. LEW: Okay. If you can answer them, then –
> THE WITNESS: Then I will. If I cannot answer it [inaudible 00:01:14] –
> MR. RAMSEY: Okay. So you're comfortable – are you comfortable answering some questions? We're going to ask you some questions. Are you comfortable answering without a lawyer [inaudible 00:01:20] or present?
> **THE WITNESS: I'm not comfortable,** but I can -- I will do it**.**
> MR. LEW: I'm sorry. You said you are -- you're comfortable and you will do it?
> **THE WITNESS: I will not -- I am not comfortable.**
> MR. LEW: You're not comfortable?
> **THE WITNESS: Yeah.**
> MR. LEW: Okay. So do you -- but you're going to -- you'll -- you'll do it -- you want to answer the questions? Do you want to try to answer the questions?
> THE WITNESS: I want to try to answer the questions […] So I'm just letting you know that **I'm not comfortable.**
> MR. LEW: Okay.
> MR. RAMSEY: Okay.
> MR. LEW: Sure.
> MR. RAMSEY: That's okay. And so with that being said, if you don't mind signing, just says I've read your rights and you understand your rights. If you can sign right here? Thank you. Sign here.
>
> (Shin Decl. Ex. B at 2:25-4:15 [emphasis added], Ex. G (file A) [excerpts of the interrogation recording].)

The agents pressured Ms. Cabactulan into answering questions in the guise of "confirming" whether she wanted a lawyer, *after* she had already asked for the presence of a lawyer. (*Id.*) Ms. Cabactulan felt like she had to oblige them because they kept pushing her after she twice said she wanted a lawyer, and she was fearful of them. (Cabactulan Decl. ¶¶ 11, 12.) She signed the document placed in front of

her out of fear. (*Id*.) She did not know what she was signing. Nor could she actually understand the document in front of her because she was in pain and dizzy and nauseated due to her illness, her vision was blurry, and she felt pressured. (*Id*.)

Ms. Cabactulan did not understand that she could still refuse to speak to them or sign the document after the agents dismissed her request for a lawyer. (Cabactulan Decl. ¶ 12.) It was the first time that she had ever been questioned by any law enforcement officers. (*Id*.) Given her inexperience, naiveté, medical suffering, and the agents' brutal intrusion into her bedroom, she felt overborne, scared, and confused. (*Id*.) She worried that disagreeing with what the agents were pushing for would make them angry, and this prospect frightened her even further. (*Id*.)

Finally, Ms. Cabactulan did not know and was not told that she was already facing criminal charges when she was asked to sign the alleged waiver. (Shin Decl. Ex. B at 61:22-62:19, Ex. G (file D).) Even when she asked the agents about the purpose of the interrogation, the agent did not tell her she had already been charged:

> MR. LEW: You have any questions for us, Guia?
> THE WITNESS: Yeah.
> MR. LEW: Okay.
> **THE WITNESS: Why -- why this thing?**
> MR. LEW: Why this thing?
> **THE WITNESS: Yeah.**
> MR. LEW: I think you know why. I just think you're not telling us why.
> **THE WITNESS: No. I was surprised when you -- you broke my door. So everything is broken and I'm worried that everything is broken.**
> MR. RAMSEY: Well --
> **THE WITNESS: I was so scared because I was sleeping. So I was telling them, what's going on? So the girl said, we will explain it later, so don't worry, so you're fine, you'll be okay. So I did not think of anything was -- because we -- we're in a treatment house. We did not do anything wrong. So we're just workers working dedicatedly to serve God. So I feel so awful that this thing happened.**
> MR. LEW: All right.· And you don't have any idea as to why?
> **THE WITNESS: No.**

(*Id.* [emphasis added].)

The agents still did not respond to her question right away. Instead, they

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

waited until the very end of the interrogation to advise Ms. Cabactulan that she had been criminally charged, the nature of offenses she was charged with, and the purpose of the interrogation, at which time she repeated her request to have counsel:

> Q. No. The reason we are here today is because we have a search warrant for this location. We have a search warrant for this location, and we have an arrest warrant for you. So after this interview, you're going to be transported down to Orange County to be processed downtown.
> A. Me?
> Q. Yes. You.
> A. Why?
> Q. You have been charged with conspiracy to commit immigration fraud.
> A. My God.
>
> ***
> MR. RAMSEY:· I can't tell you that at this point. There will be a hearing this afternoon, and you'll know more [inaudible 01:42:48] But with that being said, with that information, is there anything else you'd like to say to us, or anything else from what you've told us earlier that maybe you want to elaborate on? This would be your time.
> **THE WITNESS:· I need my lawyer.**
>
> (Shin Decl. Ex. B at 79:18-81:3 [emphasis added], Ex. G (file E).)

Without having been told that she had been criminally charged, Ms. Cabactulan did not knowingly waived her *Miranda* rights. In any event, she had twice asked for an attorney prior to signing the waiver.

## E.    Involuntary Statements

Prior to and during the interrogation, Ms. Cabactulan advised the agents of her illness and the pain she was experiencing. (Cabactulan Decl. ¶¶ 7, 13; Shin Decl. Ex. B at 12:2-15, Ex. G (file B) ["I have been getting sick since last year. So I stayed in bed all the time … I have been so sick."]; Taguiang Decl. ¶ 6.) From the moment that the agents dragged her out of her bed, her sickness was apparent to anyone who looked at her. (Cabactulan Decl. ¶¶ 7, 8, Taguiang Decl. ¶ 6.) She could barely stand so the agents had to roll her out of her room on a wheeled chair to the place of interrogation. (Cabactulan Decl. ¶ 8.) They even had to assist her to put on her pants because she was so frail. (*Id.* ¶ 7.)

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

As the day progressed, her pain, dizziness, and nausea worsened, and the fact that she was given no food at all exacerbated her conditions. (Cabactulan Decl. ¶¶ 9, 13.) The agents kept her waiting in a room handcuffed for hours, and refused her request for a bathroom break, which was particularly painful and humiliating to her given her bladder and kidney conditions. (*Id.* ¶ 9.) Combined with the sudden and violent encounter with the heavily armed agents, her medical conditions, pain, and inability to relieve herself made her feel extremely scared, vulnerable, and humiliated. (*Id.* ¶¶ 9-13.)

All of the foregoing factors also affected her ability to stay alert and responsive to the agents' questioning, which prompted the agents to call her name repeatedly to get her attention. (Cabactulan Decl. ¶ 13; Shin Decl. Ex. B at 15:7-14, 51:5-11.) While Ms. Cabactulan was being questioned, she had to close her eyes because of the pain. (Cabactulan Decl. ¶ 13.) Some 40 minutes into the interrogation, she asked the interrogators to stop because she could not bear the pain any longer. The agents ignore her plea and pressured her for another hour:

Q. Guia, you okay? You want to --
**A. I'm in pain.**
Q. Would you like to continue talking to us?
**A. No more.**
Q. We have a few more questions we'd like to ask. Would you be still willing to -- to answer?
A. Okay.

(Shin Decl. Ex. B at 37:14-20 [emphasis added], Ex. G (file C).)

The agents exploited tactics to ignore her plea to stop the interrogation and overbear Ms. Cabactulan's free will. She feared their anger. (Cabactulan Decl. ¶ 12.) Not until after the interrogation concluded was Ms. Cabactulan finally allowed to use the bathroom. (*Id.* ¶ 14.) A female agent accompanied her into the bathroom, which has no stalls or dividers, and stood in there with her while Ms. Cabactulan defecated. (*Id.*) Ms. Cabactulan was mortified that the agent was there watching and listening to her but was too afraid to say anything. (*Id.*)

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

## III.   ARGUMENT

### A.   Ms. Cabactulan's Statement Should Be Suppressed Because They Were Obtained In Violation Of *Miranda*.

#### 1.   The Alleged Waiver, Given *After* Ms. Cabactulan Invoked Her Right To Counsel. Is Invalid As A Matter Of Law.

At the inception of the interrogation, Ms. Cabactulan twice requested the presence of a lawyer and told the agents repeatedly that she was not comfortable answering questions without counsel. (Shin Decl. Ex. B at 2:25-4:15, Ex. G (file A).) The FBI agents deliberately ignored her pleas and pressured her to sign the *Miranda* waiver. (*Id.*.) A waiver given *after* the defendant invokes her right to counsel is invalid as a matter of law. *Edwards v. Arizona*, 451 U.S. 477, 484 (1981) ("[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."); *see also Michigan v. Harvey*, 494 U.S. 344, 349 (1990) (once defendant invokes his right to counsel, subsequent waiver of that right—even if voluntary and knowing under traditional standards—is "presumed invalid").

The U.S. Supreme Court has consistently held that once an accused invokes his right to counsel, he is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication" with the law enforcement. *Edwards*, 451 U.S. at 484; *Harvey*, 494 U.S. at 350; *see also Montejo v. Louisiana,* 556 U.S. 778, 789, 794 (2009) (holding that *Edwards*' prophylactic protection of the *Miranda* rights is "meant to prevent police from badgering defendants into changing their minds about their rights"; thus, once such a defendant has invoked his right to have counsel present, interrogation must stop).

Here, the interrogation recording clearly demonstrates that Ms. Cabactulan did not initiate further communication with the agents after invoking her right to counsel. Rather, it was the agents who—in the guise of wanting to "confirm" her

15

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

wish to have counsel present even after she twice told them that she wanted a lawyer—continued to pressure her into signing the alleged waiver and answering questions. Sick, humiliated, scared, and confused, Ms. Cabactulan felt coerced to satisfy the agents who were frightening her. (Shin Decl. Ex. B at 2:25-4:15, 62:5-16, Ex. G (file A); Cabactulan Decl. ¶¶ 11-13.)

The agents' conduct in continuing with their questioning and pressuring her to sign a waiver in deliberate disregard of her *Miranda* rights is the precisely the type of "badgering" that the U.S. Supreme Court warned against in *Edwards*, *Harvey*, and *Montejo*. *See also Martinez v. Cate*, 903 F.3d 982, 997-98 (9th Cir. 2018) (where custodial interrogation did not stop after defendant invoked his right to counsel, "the only reasonable interpretation of [detective's] responses to [defendant's] invocation of the right to counsel is that the detective was 'badgering [defendant] into waiving his previously asserted *Miranda* rights.'") (*citing Harvey*, 494 U.S. at 350).

### 2.    Ms. Cabactulan's Alleged Waiver Of Her *Miranda* Rights Was Not Voluntary Or Knowing.

Under the circumstances described above, the government cannot meet the heavy burden of proving that Ms. Cabactulan's *Miranda* waiver was voluntary, knowing, and intelligent. *Miranda v. Arizona*, 384 U.S. 436, 444, 475 (1966); *see United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984) (holding that the government's burden to show the validity of *Miranda* waivers "is great," and courts "must indulge every reasonable presumption against waiver of fundamental constitutional rights"); *see also United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (presumption against *Miranda* waivers) (citations omitted).

"Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Collazo v. Estelle*, 940 F.2d 411, 415 (9th Cir. 1991) (*quoting Moran v. Burbine*, 475 US 412,

16

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

421 (1986)). Such totality of the circumstances include the "background, experience, and conduct of defendant," as well as defendant's state of health and medical conditions at the time of the waiver was given. *Garibay*, 143 F.3d at 536 (*quoting United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir.1986)); *Mincey v. Arizona*, 437 U.S. 385, 401-02 (1978); *United States v. Breton-Rodriguez*, 232 F. App'x 725, 726 (9th Cir. 2007).

The totality of the circumstances of the January 20, 2020 interrogation demonstrates that Ms. Cabactulan's alleged *Miranda* waiver was neither voluntary nor knowing. Ms. Cabactulan, with preexisting health conditions and with no prior experience in the criminal justice system, was dragged from her bed in the early hours of the morning at gun point. Agents chained and handcuffed her. They would not let her use the bathroom, even though she had just had a surgery related to her kidneys and bladder. She was in intense pain and still experiencing side effects from her recent surgery. (Cabactulan Decl. ¶¶ 6-9.) Two agents interrogated her without reprieve despite her telling them she was in great pain and did not want to go on. This was a textbook example of agents making a bad-faith, calculated decision to try to coerce their target into making admissions and deal later with the risk of a judge throwing out the interrogation.

Anyone could see Ms. Cabactulan was sick and suffering. The agents even had to help her put on her pants and wheel her out of her room because she could not stand or walk. (*Id.* ¶¶ 7, 8.) When the agents placed the waiver form in front of Ms. Cabactulan, she was dizzy and nauseated. Her vision blurred. She was tired and in pain. It is well-accepted that pain, and a person's medical condition, may overbear her will and render a *Miranda* waiver involuntary or unknowing. *See e.g., Mincey*, 437 U.S. at 401-02 (holding that defendant's hospital bed statements, made while in pain and shock, were not voluntary); *United States v. Breton-Rodriguez*, 2006 WL 2228843, at *1 (D. Ariz. Aug. 3, 2006), *aff'd*, 232 F. App'x 725 (9th Cir. 2007) (*Miranda* waiver invalid when defendant was in pain and hooked up to a morphine

17

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

drip); *Breton-Rodriguez*, 232 F. App'x at 726 (defendant's pain and medication suggest "he lacked the 'awareness' knowingly and intelligently to waive his rights as a matter of fact").

Furthermore, Ms. Cabactulan told the agents twice that she wanted a lawyer present and that she did not want to answer questions without a lawyer before they made her sign the waiver. (Shin Decl. Ex. B at 2:25-4:15, Ex. G (file A).) Throughout the interrogation, the agents consciously did not advise her that she was facing criminal charges, or that she was a target of their criminal investigation, even though she told them she did not know why she was being questioned. (*Id.*) At the time she signed the alleged waiver, Ms. Cabactulan clearly did not know that the agents intended to use her statements to secure her conviction. *See Moran*, 475 U.S. at 420, 422–23 (for a *Miranda* waiver to be valid, the State "must fully apprise the suspect of the State's intention to use his statement secure a conviction"); *cf. Norman v. Ducharme*, 871 F.2d 1483, 1487 (9th Cir. 1989) (holding that defendant's waiver was knowing and intelligent where he was shown a copy of his arrest warrant, which was sufficient to "apprise a lay person . . . of the nature of the crime for which he was being arrested and the gravity of his situation").

An accused's relinquishment of her constitutional rights must be "the product of a free and deliberate choice rather than intimidation, coercion or deception" and "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Collazo*, 940 F.2d at 415 (*citing Colorado v. Spring*, 479 U.S. 564, 573 (1987)). In her state of illness, pain, and fear, Ms. Cabactulan's will was easily overborn by the agents who deliberately ignored her obvious sickness and frail state of mind. She could not understand what the waiver meant or the extent of her constitutional rights, nor did she think she could dare refuse what was asked of her by the agents. (Cabactulan Decl. ¶¶ 11-12.) Under the totality of the circumstances explained above, Ms. Cabactulan's alleged waiver was not made freely or knowingly. It was the result of coercion and involuntary.

18

**B.** **This Court Should Suppress Ms. Cabactulan's Statements On The Independent Basis That They Were Involuntary.**

**1.** **The Government Bears The Burden To Show Ms. Cabactulan's Statements Were Voluntary.**

Even absent a *Miranda* violation, a statement given during the interrogation must be suppressed when the totality of the circumstances demonstrates that it was involuntary, as the use of an otherwise involuntary statement violates a defendant's right to due process. *Blackburn v. Alabama*, 361 U.S. 199, 205, 208 (1960); *DeWeaver v. Runnels*, 556 F.3d 995, 1002–03 (9th Cir. 2009). It is the government's burden to prove at least by a preponderance of the evidence that the statements were voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Bautista*, 362 F. 3d 584, 589 (9th Cir. 2004).

The test for determining whether a statement is involuntary is whether, considering the totality of the circumstances, it was obtained by means of physical or psychological coercion or improper inducement such that the suspect's will was overborne. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981); *Collazo*, 940 F. 2d at 415. In *Malloy v. Hogan*, the Supreme Court summarized: "[w]e have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." 378 U.S. 1, 7 (1964) (citing *Haynes v. Washington*, 373 U.S. 503 (1963)).

**2.** **The Totality of The Circumstances Plainly Shows Ms. Cabactulan's Statements Were Involuntary.**

The assessment of the totality of the circumstances includes consideration of the physical and mental conditions of the defendant, his or her experience with the criminal justice system, the timing, length, and location of the interrogation, and the lack of counsel or inadequacy of warnings as to constitutional rights. *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (numerous citations omitted). *See e.g.,* *Greenwald v. Wisconsin*, 390 U.S. 519, 520-21 (1968) (confession inadmissible

19

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

where defendant, suffering from high blood pressure, without medication or food or the assistance of counsel, wrote down his confession, even though he was advised of his constitutional rights); *Reck v. Pate*, 367 U.S. 433, 441–42 (1961) (confessions inadmissible as they were obtained while defendant, who lacked previous experience with police, was weakened and in intense pain, deprived of food, without counsel or assistance of family or friends); *Jackson v. Denno*, 378 U.S. 368, 391-92 (1964) (considering factors such as defendant's physical pain, effect of drugs, and withholding of water).

The court may also consider the defendant's demeanor and alertness during the questioning, and whether he was able to follow instructions and answer questions. *See e.g., Doody v. Ryan*, 649 F.3d 986, 1012-13 (9th Cir. 2011) (analysis of the interrogation tape and transcript showed defendant was not alert or responsive); *Young v. Hedgpeth*, 2009 WL 2407946, at *9 (C.D. Cal. Aug. 5, 2009) (considering defendant's demeanor during the interview and indication of any emotional distress in assessing whether his statement was impeded by his physical and emotional condition).

The various facets of the January 29, 2020 interrogation make it plain that under the totality of the circumstances, Ms. Cabactulan's statements were not made voluntarily:

*First*, Ms. Cabactulan was not adequately apprised of her constitutional rights. She did not know she was the target of a criminal investigation and was not told of the nature of the offenses for which she was being investigated by the FBI. *See United States v. Boche-Perez*, 755 F.3d 327, 342–43 (5th Cir. 2014) (whether defendant was aware of the potential charges against him when he gave his statement is one of the factors in assessing voluntariness of confession). The agent intentionally withheld such critical information until they were done questioning her. (Shin Decl. Ex. B at 61:22-62:19, 79:18-81:3, Ex. G (files D, E).) No attorney was present during the FBI's interrogation despite her requests to have one. (Shin

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING

Decl. Ex. B at 2:25-4:15, Ex. G (file A).)

*Second*, Ms. Cabactulan has no experience in the criminal justice system, never having had prior significant dealings with the law enforcement. (Cabactulan Decl. ¶ 12.) She was fearful of the agents who had treated her violently and disrespectfully since that morning, and reasonably believed that she could not refuse them. (*Id.* ¶¶ 12, 13.)

*Third*, at the time of interrogation, she was physically impaired and suffering from pain and aftereffects of a recent surgery, and was under extreme emotional distress and humiliation. (*Id.* ¶¶ 6-13.)

*Fourth*, her demeanor during the interrogation clearly indicated that she was in pain and was not alert—and she expressed her sickness to the agents verbally before and during the interrogation. (Shin Decl. Ex. B at 12:2-15, 37:14-20, Ex. G (file B); Cabactulan Decl. ¶¶ 7, 13; Taguiang Decl. ¶ 6.)

Her fear was intensified by the agents' refusal to allow her any bathroom breaks and refusing to stop the interrogation despite her plea to stop because she was in pain. (Shin Decl. Ex. B at 37:14-20, Ex. G (file C); Cabactulan Decl. ¶ 13.)

Given the totality of these circumstances, Ms. Cabactulan's statements cannot be viewed as voluntary.

## IV.    CONCLUSION

If the government opposes this motion, this Court is required to make factual determinations regarding Ms. Cabactulan's alleged statements on January 29, 2020. *See United States v. Prieto-Villa*, 910 F.2d 601, 606-10 (9th Cir. 1990) (courts are obligated by Fed. R. Crim. P. 12 to make factual findings); Fed. R. Crim. P. 12(d). Because "suppression hearings are often as important as the trial itself," this Court must determine whether the agents violated *Miranda* while questioning Ms. Cabactulan, and whether her statements were voluntarily given. *See id.* at 609-10.

For the foregoing reasons, Ms. Cabactulan respectfully requests that the Court grant her motion on the papers, or at minimum, hold an evidentiary hearing to

21

determine whether her *Miranda* rights were violated and whether her statements were voluntary.

DATED:  September 21, 2020        Gary S. Lincenberg
                                 Naeun Rim
                                 Kate S. Shin
                                 Bird, Marella, Boxer, Wolpert, Nessim,
                                 Drooks, Lincenberg & Rhow, P.C.


                                 By:     /s/ Nauen Rim
                                              Naeun Rim
                                     Attorneys for Defendant Guia Cabactulan

22

DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING