Gary S. Lincenberg - State Bar No. 123058
  glincenberg@birdmarella.com
Naeun Rim - State Bar No. 263558
  nrim@birdmarella.com
Kate S. Shin - State Bar No. 279867
  kshin@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant
Guia Cabactulan

Thomas H. Bienert, Jr. (SBN 135311)
  tbienert@bienertkatzman.com
James D. Riddet (SBN 39826)
  jriddet@bienertkatzman.com
Gerloni S. Cotton (SBN 310868)
  gcotton@bienertkatzman.com
BIENERT | KATZMAN, PC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

Attorneys for Defendant
Marissa Duenas

Mark A. Byrne (SBN 116657)
  markbyrne@byrnenixon.com
BYRNE & NIXON LLP
888 West Sixth Street, Suite 1100
Los Angeles, California  90017
Telephone: (213) 620-8003
Facsimile: (213) 620-8012

Attorney for Defendant
Amanda Estopare

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>GUIA CABACTULAN, MARISSA DUENAS and AMANDA ESTOPARE,<br><br>　　　　Defendants. | CASE NO. 2:20-cr-00079-TJH<br><br>**DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION TO DISMISS INDICTMENT FOR VIOLATION OF CONSTITUTIONAL RIGHTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>*[Filed Concurrently with Declaration of N. Rim; Declaration of F. Taguiang; Declaration of A. Hussain]*<br><br>Date:　　October 19, 2020<br>Time:　　10:00 a.m.<br>Crtrm.:　9B<br><br>Assigned to Hon. Terry J. Hatter, Jr |

3669298

1

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 19, 2020, at 10:00 a.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Terry J. Hatter, United States District Court Judge, located at 350 W. 1st Street, Los Angeles, California 90012, Courtroom #9B, 9th Floor, Defendants Guia Cabactulan, Marissa Duenas, and Amanda Estopare ("Defendants") will, and hereby do, move the Court to dismiss the Indictment for failure to state an offense, for lack of specificity, and for violation of Defendants' constitutional rights.

This Motion is made pursuant to Federal Rules of Criminal Procedure 12(b)(3)(B)(i), (iii), and (v), and the First, Fifth, Sixth, and Eighth Amendments of the United States Constitution.

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, accompanying Declarations and Exhibits, the Indictment, and such other and further argument and evidence as may be presented to the Court at the hearing on this matter.

DATED:  September 21, 2020

Gary S. Lincenberg
Naeun Rim
Kate S. Shin
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By: ___/s/ Naeun Rim___
Naeun Rim
Attorneys for Defendant Guia Cabactulan

3669298

2

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

DATED:  September 21, 2020         Thomas H. Bienert, Jr.
                                   James D. Riddet
                                   Gerloni S. Cotton
                                   BIENERT | KATZMAN, PC


                                   By:     _/s/ James S. Riddet_____
                                              Thomas H. Bienert, Jr.
                                           Attorneys for Defendant Marissa Duenas

DATED:  September 21, 2020         Mark A. Byrne
                                   BYRNE & NIXON LLP


                                   By:     _/s/ Mark A. Byrne_____
                                              Mark A. Byrne
                                           Attorney for Defendant Amanda Estopare

        *Pursuant to Local Rule 5-4.3.4(2), the filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

3669298

3

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................... 10

II. BACKGROUND ........................................................................................... 13

    A. The Kingdom of Jesus Christ, The Name Above Every Name ............ 13

        1. Miracle Workers ...................................................................... 16

        2. Ministries ................................................................................. 19

        3. Discipline ................................................................................. 21

    B. The Inhumane Detention of Guia Cabactulan ..................................... 22

    C. The Inhumane Detention of Marissa Duenas ...................................... 26

    D. Severely Limited Access to Counsel ................................................... 26

III. THE INDICTMENT ..................................................................................... 27

IV. THE FIRST AMENDMENT AND RFRA REQUIRE DISMISSAL OF THE INDICTMENT ..................................................................................... 29

    A. The Indictment Imposes a Substantial Burden on the Exercise of Religion ............................................................................................... 32

    B. The First Amendment's "Ministerial Exception" Bars Prosecution Of This Case Because Miracle Workers Are Part of the Church's Religious Order ............................................................... 33

    C. The Government Has No Compelling Interest In Prosecuting Conduct That Is Protected By the Ministerial Exception ..................... 38

    D. The First Amendment and RFRA Violations Infect the Entire Indictment .......................................................................................... 40

V. AS TO MS. CABACTULAN AND MS. DUENAS, THE INDICTMENT MUST BE DISMISSED PURSUANT TO THE COURT'S SUPERVISORY POWERS FOR VIOLATION OF THEIR FIFTH AND SIXTH AMENDMENT RIGHTS ............................................. 42

    A. Inadequate Medical Care, Cruel Lockdown Conditions, and Length of Detention Amount to Unconstitutional Punishment of Pretrial Detainees In Violation of the Fifth and Eighth Amendments ........................................................................................ 44

    B. Lack of Regular Access to Confidential, In-Person Legal Visits or Videoconferences Violates the Sixth Amendment Right to Counsel ................................................................................................ 47

VI. CONCLUSION ............................................................................................. 50

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alcazar v. Corp. of the Catholic Archbishop of Seattle*,
   627 F.3d 1288 (9th Cir. 2010) ................................................................................36

*Alicea-Hernandez v. Catholic Bishop of Chicago*,
   320 F.3d 698 (7th Cir. 2003) .................................................................................37

*Am. Legion v. Am. Humanist Ass'n*,
   139 S. Ct. 2067 (2019).............................................................................................31

*Bell v. Wolfish*,
   441 U.S. 520 (1979) ................................................................................................44

*Bollard v. California Province of the Soc'y of Jesus*,
   196 F.3d 940 (9th Cir. 1999) .................................................................................31

*Castro v. Cty. Of Los Angeles*,
   833 F.3d 1060 (9th Cir. 2016) ................................................................................45

*City of Revere v. Mass. Gen. Hosp.*,
   463 U.S. 239 (1983) ................................................................................................44

*Claire Headley v. Church of Scientology Int'l*,
   No. CV 09-3987 DSF MAN, 2010 WL 3184389 (C.D. Cal. Aug. 5,
   2010), *aff'd,* 687 F.3d 1173 (9th Cir. 2012) ....................................31, 34, 35, 39

*DeShaney v. Winnebago Cty. Dep't. of Soc. Servs.*,
   489 U.S. 189 (1989) ................................................................................................45

*Doe v. Kelly*,
   878 F.3d 710 (9th Cir. 2017) .................................................................................44

*Dreher v. Sielaff*,
   636 F.2d 1141 (7th Cir. 1980) ................................................................................48

*Estelle v. Gamble*,
   429 U.S. 97 (1976) ..................................................................................................44

*Everson v. Bd. of Educ.*,
   330 U.S. 1 (1947) ....................................................................................................33

5

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

*Farmer v. Brennan*,
  511 U.S. 825 (1994) ...................................................................................44, 45

*Fisher v. United States*,
  425 U.S. 391 (1976) .........................................................................................48

*Gibson v. County of Washoe*,
  290 F.3d 1175 (9th Cir. 2002) .........................................................................45

*Gordon v. Cty. of Orange*,
  888 F.3d 1118 (9th Cir. 2018) .........................................................................45

*Headley v. Church of Scientology Int'l*,
  687 F.3d 1173 (9th Cir. 2012).....................................................34, 35, 36, 37

*Hoptowit v. Ray*,
  682 F.2d 1237 (9th Cir. 1982) .........................................................................45

*Hosanna-Tabor v. EEOC*,
  565 U.S. 171 (2012) ..................................................................................35, 36

*Jett v. Penner*,
  439 F.3d 1091 (9th Cir. 2006) .........................................................................46

*Kansas v. Ventris*,
  556 U.S. 586 (2009) .........................................................................................48

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*,
  344 U.S. 94 (1952) ...........................................................................................33

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971): (1).................................................................................31

*Lewis v. Holy Spirit Ass'n for Unification of World Christianity*,
  589 F. Supp. 10 (D. Mass. 1983).....................................................................39

*Marc Headley v. Church of Scientology Int'l*,
  No. CV 09-3986 DSF, 2010 WL 3157064 (C.D. Cal. Aug. 5, 2010),
  *aff'd*, 687 F.3d 1173 (9th Cir. 2012) .........................................................*passim*

*Meroni v. Holy Spirit Ass'n for Unification of World Christianity*,
  119 A.D.2d 200 (1986)....................................................................................39

3669298

6

*Newdow v. Rio Linda Union Sch. Dist.*,
597 F.3d 1007 (9th Cir. 2010)...............................................................................31

*Or. Advocacy Ctr. v. Mink*,
322 F.3d 1101 (9th Cir. 2003)...............................................................................44

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020).............................................................................12, 33, 36

*Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*,
819 F.2d 875 (9th Cir. 1987).................................................................................39

*Rayburn v. Gen. Conference of Seventh-Day Adventists*,
772 F.2d 1164 (4th Cir. 1985)...............................................................................37

*Ross v. Metro. Church of God*,
471 F. Supp. 2d 1306 (N.D. Ga. 2007) .................................................................37

*Serbian Eastern Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976) ..............................................................................................33

*Texas v. Cobb*,
532 U.S. 162 (2001) ..............................................................................................48

*United States v. Babichenko*,
No. 1:18-CR-00258-BLW, 2019 WL 3558484 (D. Idaho Aug. 5,
2019) .....................................................................................................................47

*United States v. Barrera-Moreno*,
951 F.2d 1089 (9th Cir.1991)................................................................................42

*United States v. Boyll*,
774 F. Supp. 1333 (D.N.M. 1991).........................................................................30

*United States v. Buddenberg*,
No. CR-09-00263 RMW, 2010 WL 2735547 (N.D. Cal. July 12,
2010) .....................................................................................................................41

*United States v. Cecil*,
608 F.2d 1294 (9th Cir. 1979)...............................................................................42

*United States v. Cerullo*,
No. CRIM. 05CR1190BEN, 2007 WL 2683799 (S.D. Cal. Sept. 7,
2007) .....................................................................................................................30

3669298

7

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

*United States v. Lutz*,
   No. CR1900692001TUCRMBGM, 2019 WL 5892827 (D. Ariz. Nov. 12, 2019) ................................................................................................50

*United States v. Munoz-Garcia*,
   No. CR-19-01670-TUC-JGZ, 2020 WL 1929204 (D. Ariz. Apr. 21, 2020) .....................................................................................................50

*United States v. Resendiz-Guevara*,
   145 F. Supp. 3d 1128 (M.D. Fla. 2015) ..............................................49

*United States v. Stinson*,
   647 F.3d 1196 (9th Cir. 2011) ............................................................43

*United States v. Trujillo-Alvarez*,
   900 F. Supp. 2d 1167 (D. Or. 2012)..............................................43, 50

*United States v. W.R. Grace*,
   526 F.3d 499 (9th Cir. 2008) ..............................................................43

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) ............................................................................48

*Watson v. Jones*,
   80 U.S. 679 (1871) ..............................................................................30

*Wayte v. United States*,
   470 U.S. 598 (1985) ............................................................................41

*Weatherford v. Bursey*,
   429 U.S. 545 (1977) ............................................................................48

*Werft v. Desert Sw. Annual Conference of United Methodist Church*,
   377 F.3d 1099 (9th Cir. 2004).........................................30, 33, 34, 38

**Statutes**

8 U.S.C. § 1325(c) ..............................................................................27

18 U.S.C. § 371....................................................................................27

18 U.S.C. § 1546(a) .............................................................................27

18 U.S.C. § 1570(a) .............................................................................27

3669298

8

18 U.S.C. § 1592(a)(3) ...............................................................................27

42 U.S.C § 2000bb–1...................................................................................32

Fed. R. Crim. P. 7(c)(1) ..............................................................................41

Fed. R. Crim. P. 12(b)(3)........................................................................30, 41

**U.S. Constitution**

First Amendment ....................................................................................*passim*

Fifth Amendment..............................................................................13, 40, 44, 45

Sixth Amendment ...................................................................................*passim*

Eighth Amendment.....................................................................................44

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.      INTRODUCTION

This case is one of egregious Government overreach.  By now, the Court is familiar with the Government's go-to refrain: that Defendants Guia Cabactulan, Marissa Duenas, and Amanda Estopare (collectively "Defendants"), members of the Kingdom of Jesus Christ (the "Kingdom" or "Church"), are allegedly "human traffickers" who are perpetuating a form of "modern-day slavery" through their Church activities.  By repeating this damaging rhetoric, the Government has taken advantage of the Western world's lack of familiarity with the Church and its practices and successfully portrayed what is constitutionally-protected religious conduct as human trafficking.  To accomplish this, the Government intentionally obscured a critical fact—that Ms. Cabactulan, Ms. Duenas, and Ms. Estopare, along with all of the alleged "victims" in this case, are or were church missionaries known as Full Time Miracle Workers ("Miracle Workers") who, after going through a vigorous application process, agreed to devote their lives to the Church and are part of the Church's official religious order.  The Miracle Worker status of the witnesses involved in this case brings the so-called human trafficking allegations squarely within the ambit of the First Amendment's "ministerial exception" doctrine, which prohibits Government intrusion into matters of church governance.

As part of their religious oath, Miracle Workers agree to live in communal settings, give up all world remuneration, and live a life of obedience in service of their faith—similar to well-known rules followed by many Catholic nuns, Buddhist monks, and members of other religious orders that are more commonly known in America society.  While such rules may seem strict by secular standards—and may even give arise to secular criticism of the Church's practices —the enforcement of such rules amongst official members of a religious order is constitutionally-protected by the First Amendment.  Indeed, similar conduct has been found to be protected religious activity even in the context of *civil* cases brought under the

3669298

10

Trafficking Victims Protection Act ("TVPA"). *See, e.g., Marc Headley v. Church of Scientology Int'l*, No. CV 09-3986 DSF (MANX), 2010 WL 3157064, at *6 (C.D. Cal. Aug. 5, 2010), *aff'd*, 687 F.3d 1173 (9th Cir. 2012) (finding on summary judgment that, despite evidence of various forms of abuse inflicted on plaintiff, including physical abuse, determining whether Scientology's disciplinary practices on Sea Organization members "constitute involuntary servitude within the meaning of the TVPA is precisely the type of entanglement that the [First Amendment's] Religion Clauses prohibit").

The Government has glossed over the Miracle-Worker status of the cooperators to sell a human trafficking narrative. By relying on this strategy, and bribing most of the cooperators with immigration benefits that *require* many of them to claim they are victims of severe human trafficking (*see, e.g.*, Compl. p.6, ¶ 12, fn.1), the Government has succeeded in obtaining search warrants and securing the Indictment in this case. The Government has also sold this narrative to the Court in arguing for the detention of Ms. Cabactulan and Ms. Duenas, two devout women ages 60 and 42 respectively who have no criminal record and have well-documented histories of serious health conditions, ranging from hypertension to lupus. For eight months, Ms. Cabactulan and Ms. Duenas have been imprisoned at the Metropolitan Detention Center ("MDC") in the midst of a global pandemic, at times in cruel lockdown conditions, with no meaningful way to discuss the case with counsel and without access to adequate medical care. To convince the Court and the Ninth Circuit to detain the Ms. Cabactulan and Ms. Duenas for the duration of this case, the Government resorted to an inflammatory human trafficking narrative. Meanwhile, in conversation with defense counsel regarding a protective order, the prosecutors in this case conceded that there is no evidence that any of the three women charged in this case personally intimidated or threatened anybody, and that "*there were no safety concerns by the individual defendants – only the church.*" (Dkt. 99 at 4 (Decl. James Riddet ¶ 18).)

3669298

11

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

The Government's assault on the constitutional rights of the Defendants requires dismissal of the indictment under the First Amendment's Free Exercise and Establishment Clauses ("Religion Clauses").  The right to religious freedom and separation of church and state has been a cornerstone of American society since its inception.  The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  As the Supreme Court recently reiterated, the First Amendment "outlaws [government] intrusion" into matters of faith and doctrine and protects the right of religious institutions "to decide for themselves, free from state interference, matters of church government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055, 2060 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952)).  There is no greater government intrusion into matters of church governance than the criminal prosecution of church officials for their oversight of members of the church's order.  The Indictment in this case embodies just such an intrusion.  It charges three devout women, alleged to be the main Church administrators in the United States,[1] with conspiring to commit a host of federal crimes based on their alleged supervision of Miracle Workers.  These allegations run afoul of the First Amendment's Religion Clauses and require dismissal of the Indictment.  While the Government will no doubt argue that the allegations also target purely secular crimes, the Indictment lumps all of the conduct together in one jumbled conspiracy count, making it impossible to determine whether the Grand Jury indicted based on evidence of constitutionally-protected religious conduct rather than any secular crime.  The First Amendment violation therefore infects the entire Indictment, and it must be dismissed in its entirety.

---

[1]    The Indictment greatly exaggerates the role Defendants had in the Church; but that matter is left for another day.

3669298

12

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

As to Ms. Cabactulan and Ms. Duenas, who have been detained under cruel and unusual conditions for eight months based on Government exaggerations, the Court must also dismiss the Indictment pursuant to its supervisory powers for violation of their Fifth Amendment and Eight Amendment rights to due process and to be free of cruel and unusual punishment and Sixth Amendment right to effective assistance of counsel.  At minimum, the Constitution requires that Ms. Cabactulan and Ms. Estopare be released on bail pending trial and be permitted to partake in their religious activities.

## II.     BACKGROUND

### A.     The Kingdom of Jesus Christ, The Name Above Every Name

The facts in this section are supported by the concurrently-filed expert declaration of Professor Amir Hussain ("Hussain Decl."), the Chair of Theological Studies at Loyola Marymount University, and the declaration of Brother F. Jun Taguiang ("Taguiang Decl."), the head minister in charge of the Church ministers in the United States.

The Church is a religion that originated in the Philippines approximately 35 years ago and has grown over the years to have millions of followers worldwide. (Taguiang Decl. ¶ 4).  The ethnic makeup of its membership around the world is primarily Filipino.  (*Id.*)  According to Professor Hussain, the Kingdom is a Christian religion that can best be described as a new interpretation within the Protestant tradition of Christianity.  (Hussain Decl. ¶ 10.)  It is one of hundreds of new interpretations of Christianity that have emerged over the centuries, such as the Church of Jesus Christ of Latter-day Saints (also known as Mormonism) or the Jehovah's Witnesses.  (*Id.*)  The Church observes traditions that are similar to those of other Protestant movements, including holding sermons on Sundays, using songs and music at religious gatherings, and practicing baptism.  (*Id.* ¶ 11c).

The Church's practices are consistent with what is known as Restorationism, also known as Christian primitivism, which is a belief that Christian practices

3669298

13

should be returned to their original form as embodied in the New Testament. (Hussain Decl. ¶ 11.)  The Church's name reflects the its deeply held foundational belief in Jesus Chris and the Bible.  (Hussain Decl. ¶ 11a.)  "The Kingdom of Jesus Christ, The Name Above Every Name" comes from the New Testament, Philippians 2:9-11, where the Apostle Paul writes about Jesus: "Therefore God also has highly exalted Him and given Him the name which is above every name, that at the name of Jesus every knee should bow, of those in heaven, and of those on earth, and of those under the earth, and that every tongue should confess that Jesus Christ is Lord, to the glory of God the Father." (*Id.*)  The word "Kingdom" is a reference to the Kingdom of God as described in Matthew 6:9-10 of the Bible: "After this manner therefore pray ye: Our Father which art in heaven, Hallowed be thy name.  Thy kingdom come, Thy will be done in earth, as it is in heaven." (Taguiang Decl. ¶ 6.)

The Church considers its founder, Pastor Apollo Quiboloy ("Pastor"), to be the Appointed Son of God, a human being in whom the spirit of God dwells. (Taguiang Decl. ¶ 5.)  The Pastor serves a role in the Kingdom similar to that of the Pope in the Catholic church. (*Id.*)  The religious hierarchy under the Pastor includes Executive Administrators, Administrators, Coordinators, and Ministers, all of whom are also Miracle Workers (described in further detail below). (*Id.* ¶ 14.)  These roles are comparable to those of Cardinals, Archbishops, Bishops, Priests, and Deacons in the Catholic church's religious order. (*Id.*)  Ministers give Sunday sermons at local churches known as Kingdom Light Congregations ("KLCs").  There are approximately five KLCs in Southern California, located in Van Nuys, Glendale, San Bernardino, San Diego, and Orange County.  Prior to the pandemic and the FBI raid on January 29, 2020, an average of 80 to 100 members attended services at the Van Nuys KLC every Sunday. (*Id.* ¶ 3.)  Like many other Protestant denominations, the Kingdom places special emphasis on the use of song and music to praise God. (*Id.* ¶ 4; Decl. Hussain ¶ 11c.)  Many Kingdom events are organized around concerts, choirs, and performances that feature the musical talents of its

3669298

14

members.  (Taguiang Decl. ¶ 4.)

The Church is governed as a theocracy that follows the Three Pillars of the Kingdom Revelations: the Spiritual Revolution, the Financial Revolution, and the Revolution of Excellence.  (*Id*. ¶ 6.)  The Spiritual Revolution requires those who convert to the Church to leave behind a life of sin and disobedience and experience a spiritual cleansing.  (*Id*.)  The Financial Revolution replaces the spirit of poverty with the spirit of prosperity, which Church members effectuate both by accumulating spiritual wealth and by giving generously to the Church through tithes, donations, and services.  (*Id*.)  Under the Revolution of Excellence, Church members strive to live a life of excellence and always give their best to God.  (*Id*.)

These basic tenets of the faith are discussed in the Kingdom Manual, a religious text that interprets parts of the Bible and applies it to the Church's modern day operations and practice.[2]  (*Id*.)  Organized religious traditions often maintain a written set of practical guidelines similar to the Kingdom Manual and have done so for centuries.  (Hussain Decl. ¶ 6).  The Catholic Church's Archdiocese of Los Angeles, for example, has a web page called "About the Archdiocesan Catholic Center" that describes its various departments and functions, many of which are similar to the departments described in Kingdom Manual, Book 2.[3]  (*Id*.)  The United Church of Canada, the largest Protestant church in Canada, has a governance manual that is literally called *The Manual*.[4]  (*Id*.)  The Church of Jesus Christ of Latter-day Saints has a *Missionary Handbook* that contains rules and schedules that

---

[2]   Copies of Books 2 and 3 of the Kingdom Manual were produced by the Government under protective order.  Both Professor Hussain and Brother Jun discuss relevant portions of the manual in their declarations.

[3]   Available at https://old.la-archdiocese.org/org/Pages/default.aspx.

[4]   Available at https://www.united-church.ca/sites/default/files/the-manual-2019_0.pdf.

3669298

15

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

missionaries must follow while serving their time abroad.[5]  (*Id*.)

### 1.    Miracle Workers

Miracle Workers make up the backbone of the Church's religious order. Most members attend KLC worship services and participate in Bible study activities but otherwise lead independent civilian lives.  (Taguiang Decl. ¶ 7.)  Those who wish to take their faith to a higher level can apply to be Full Time Miracle Workers.[6]  (*Id*. ¶ 8.)  As set forth in the Kingdom Manual, Miracle Workers are those who enter the "fulltime ministry as the highest form of offering to our Almighty Father."  (*Id*.)

The process for becoming a Miracle Worker is lengthy, involved, and requires the following steps:

- The member must first be baptized, a process that takes an average of one year.

- Most people must have at least four years of spiritual maturity as a baptized member before they can even be considered for a Miracle Worker position.

- The person must have a "divine calling"—such as a dream, revelation, or a sign—compelling them to serve full time in the ministry.

- The person must submit a written application, undergo a psychological evaluation, and obtain an endorsement letter from a Kingdom Coordinator.

- The applicant must complete three levels of spiritual training.

- The applicant must be interviewed by Church officials.

- Once accepted, the applicant must go through a minimum 6-month apprenticeship probationary period working in one of the Kingdom's ministries before being fully accepted as a Full Time Miracle Worker.

(Taguiang Decl. ¶ 9.)

It is well-known in the Kingdom that becoming a Full Time Miracle Worker

---

[5]    Available at https://www.churchofjesuschrist.org/study/manual/missionary-handbook?lang=eng.

[6]    Sometimes "Full Time Miracle Workers" is shortened to "Miracle Worker," "FTMW," "Full Time Workers," "FTW," or "Workers." (*Id*. ¶ 8.)

3669298

16

is a life-altering commitment, similar to becoming a priest or a nun.  (*Id.* ¶ 11.) Miracle Workers live together in communal settings, referred to in the Kingdom Manual as "compounds,"  so that they can devote their entire lives to the Church. (*Id.* ¶ 10.)



Photo of Van Nuys Compound, Rim Decl., Ex C (KOJC_00021600).

Like Jesuit priests, Miracle Workers give up all of their material possessions, such as their cars and homes, to the Church when they enter the ministry.  (*Id.* ¶ 10; Hussain Decl. ¶ 16 ("The Jesuits are not allowed to have personal ownership of material possessions").)  Miracle Workers' possessions are considered to belong to and are shared by all in the Church.  (Taguiang Decl. ¶ 10.)  The Church provides for the Miracle Workers' living expenses, including food, shelter, clothing, phones, computers, and all other necessities.  (*Id.*)  In some cases, the Church pays for educational degree programs for Miracle Workers as well.  (*Id.*)  Miracle Workers largely give up their personal lives for the greater cause of the Church's ministry.

3669298

17

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

(*Id*.)  Unlike those who hold religious positions in Catholicism, Miracle Workers are allowed to marry within the Kingdom and have children, so long as they first receive permission.  (*Id*.)  Miracle Workers are to put their relationship with God above all others, and their families are considered secondary to that relationship.  (*Id*.)  According to Professor Hussain, Miracle Workers share similarities with ordained priests, nuns, or deacons in the Catholic church, deacons or missionaries among Protestant Christians, or missionaries in the Church of Jesus Christ of Latter-day Saints.  (Hussain Decl. ¶ 13.)

There are about 10,000 Full Time Miracle Workers within the Church's membership.  (Taguiang Decl. ¶ 11.)  The first priority of the Miracle Worker is evangelism—to spread the faith and grow membership.  (*Id*. ¶ 8.)  Accordingly, like missionaries in other religions, such as Mormonism, many Miracle Workers are sent abroad to proselytize and recruit membership.  (*Id*.; Hussain ¶¶ 27-28.)  The percentage of Miracle Workers as compared to ordinary Kingdom members tends to be higher in countries outside of the Philippines, where the Kingdom is less established.  (Taguiang Decl. ¶ 11.)  Of the 100 or so members of the Van Nuys congregation, for example, approximately 25% are Miracle Workers.  (*Id*.)

It is impossible to force someone to become a Miracle Worker without their consent.  (Taguiang Decl. ¶ 12.)  Freedom of Choice is a key tenet of the Church's belief system.  (*Id*.)  Members can choose to stay as visitors or baptized members for as long as they want.  (*Id*.)  Those who wish to serve in the ministry but still live separately and keep their material possessions have the option of becoming Part Time Miracle Workers, who are Miracle Members who hold minor leadership positions in the Church without having to live in the compound under communal conditions.  (*Id*.)  Because Church members believe their religion is the path to salvation, they also believe that those who want to leave the ministry altogether are being tempted by darkness.  (*Id*.)  As with most other faiths, the Church discourages members from leaving.  (*Id*.)  Ultimately under the Kingdom tradition, however,

3669298

18

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

each person has a free choice to leave.  (*Id*.)

### 2. Ministries

There are numerous departments, also called "ministries," that execute the Kingdom's various administrative functions, including the Evangelical, Admin and Finance, Social Services, Music, Education, and General Services Departments. These departments are grouped according to the 12 tribes of Israel from the Book of Genesis.  (Taguiang Decl. ¶ 13.)  These departments are similar to the way other religions organize their administration.  The Archdiocese of Los Angeles, for example, has various departments that are similar to those described in Kingdom Manual, Book 2.[7]  (Hussain Decl. ¶ 6.)  New Miracle Workers are generally assigned as apprentices in their assigned ministry, under supervision of their senior Miracle Worker, while they train to take on more senior responsibilities and positions of leadership in the Church.  (Taguiang Decl. ¶ 13.)  All of the leadership positions in the Church are filled by Miracle Workers who have come up from the lower ranks.  (*Id*. ¶ 14.)

As is common among modern religions that have not had centuries to accumulate large endowments, the Kingdom relies on tithes and fundraising activities to finance its activities and operations.  (Decl. Hussain ¶ 22.)  In particular, religious traditions that are just beginning tend to rely more heavily on the donations of non-members.  (*Id*.)  Fundraising is considered an important part of the Kingdom's Financial Revolution, particularly for those who do not have material wealth that they can donate.  (Taguiang Decl. ¶ 13.)  Under Church doctrine, volunteering one's time in fundraising efforts carries as much spiritual value as a generous tithe donation.  (*Id*.)  While some baptized members voluntarily fundraise, Miracle Workers are given greater fundraising responsibilities.  (*Id*.)  According to

---

[7]  See "About the Archdiocesan Catholic Center" at https://old.la-archdiocese.org/org/Pages/default.aspx.

3669298

19

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

Professor Hussain, the Church's Financial Revolution doctrine is consistent with a belief that is prevalent in some Protestant denominations, particularly in the Pentecostal movement, that giving to the church, whether by volunteering one's own time or through monetary donations, will ultimately lead to the increase of one's own security through God's blessings.  (Hussain Decl. ¶ 20.)  To the extent that the Church requires Miracle Workers to fundraise for long hours or donate other services without pay, that is consistent with how many other religions treat members of its religious orders.  (*Id*. ¶ 23.)

Another important part of the Kingdom's order is the Children's Joy Foundation ("CJF"), a charity founded by the Church in 1998 to help children around the world "through school sponsorship, feeding and house programs." (*See* Indictment ¶ 2.)  Within the administrative hierarchy, CJF falls under the Social Services Department and the Tribe of Dan, whose mission it is to "implement corporate social responsibility programs and projects to children and other needy sectors in the society," according to the Kingdom Manual.  (Taguiang Decl. ¶ 13.)  CJF is an award-winning charity organization that was recently lauded as the "Best Non-Governmental Organization" in the Philippines by the Department of Social Welfare and Development ("DSWD"), an official government agency of the Philippines.  On January 28, 2020, as the agents in this case were raiding the Van Nuys compound in the Pacific time zone, the DSWD Secretary was personally conferring the award to CJF at the DSWD Central Office in Quezon City, Philippines.[8]  CJF now has affiliates in at least 10 countries around world, including CJF USA, which are separate entities that do similar work and frequently collaborate with CJF on projects in Southeast Asia.  (Taguiang Decl. ¶ 13.)

---

[8]  https://mb.com.ph/2020/02/16/childrens-joy-foundation-hailed-best-ngo-by-dswd/; https://newsroomonthego.com/2020/02/17/news-dswd-recognizes-quiboloys-childrens-joy-foundation-as-best-ngo/

3669298

20

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

### 3. Discipline

The Kingdom Manual sets forth an internal disciplinary process for Miracle Workers. (Hussain Decl. ¶ 24.) Offenses include, for example, a spiritual lapse, lying, using another person's identification without permission, or stealing. (Taguiang Decl. ¶ 15) Under the discipline process, a witness must first write a written report describing the Miracle Worker's alleged offense. (*Id*.) The Miracle Worker is provided a hearing where a committee reads the accusation and allows the Miracle Worker to respond. If necessary, the committee will consider other evidence. (*Id*.; Hussain Decl. ¶ 24.) If the committee finds there to be a violation of church doctrine, it will ask the Miracle Worker to acknowledge the wrongdoing in a confessional letter and sign a recommitment letter. (Taguiang Decl. ¶ 15; Hussain Decl. ¶ 25.) Acceptance of responsibility factors into the disciplinary decision. (Taguiang Decl. ¶ 15.) Disciplinary actions include counseling, taking time for personal reflection and prayer, and fasting. (*Id*.) The toughest form of discipline is excommunication. (Taguiang Decl. ¶ 15; Hussain Decl. ¶ 25.) The Church's system of disciplining members of its religious order are similar to other religions. (Hussain Decl. ¶ 26.) In the Catholic church, for example, there is a system under Canon law for the disciplining of its priests, which may range from requiring certain practices like prayer, fasting, or repentance. (*Id*.) More serious forms of discipline can include censure or loss of clerical state. (*Id*.)

Miracle Workers consider fasting to be a form of spiritual cleansing that brings them closer to God, whether or not disciplined. (Taguiang Decl. ¶ 16.) The Kingdom has designated meditation areas where people can go to fast. (*Id*.) One of these areas is a place called the Upper Six, which is a garden on Glory Mountain in Davao City in the Philippines. (Taguiang Decl. ¶ 19, Ex. 2.)



Photo of Upper Six from Taguiang Decl., Ex. D at 11.

### B.    The Inhumane Detention of Guia Cabactulan

On January 29, 2020, at approximately 6:00 a.m., a team of more than 80 SWAT team members and federal agents, armed with military-grade tactical gear and weapons, swarmed the Kingdom's Van Nuys Compound located on Vanowen Street. Ms. Cabactulan was asleep in her room when they broke down her door. (Rim Decl., Ex. A (Declaration of Guia Cabactulan ("Cabactulan Decl.") ¶ 3.)[9] At the time of the raid, she was on break from her religious duties because she was recovering from an emergency surgery she had undergone earlier that week due to

[9] Defense counsel has had extreme difficulty accessing Ms. Cabactulan, who is detained at the Metropolitan Detention Center ("MDC"). (Rim Decl. ¶¶ 2-6.) Defense counsel has thus submitted an unsigned copy of Ms. Cabactulan's declaration as Exhibit A to the Declaration of Naeun Rim, the contents of which were confirmed with Ms. Cabactulan. (Rim Decl. ¶ 7.) Throughout this motion, citations to "Cabactulan Decl." will refer to Exhibit A to Ms. Rim's declaration. Counsel will file an executed version of Exhibit A prior to the hearing.

3669298

22

an acute kidney infection caused by bladder leakage and staghorn kidney stones. (*Id*. ¶¶ 2-3.)  The facts surrounding the horrific and humiliating treatment of Ms. Cabactulan during her arrest and unlawful interrogation are set forth in greater detail in the concurrently filed motion to suppress her statement and accompanying declarations.



Photo of January 29, 2020, raid from concurrently filed Taguiang Declaration in Support of Guia Cabactulan's Motion to Suppress Statement, Ex J at 12.

After having kept her in handcuffs for hours without food, the agents tried to bring Ms. Cabactulan to the Santa Ana Jail at around 2:00 p.m. for booking; the jail could not process her because she was too sick to answer questions.  (Rim Decl. ¶ 4.)  The agents then took her to the emergency room of a hospital nearby.  She was given medical tests and prescribed antibiotics.  (*Id*. ¶ 4.)  She returned to the Santa Ana jail and was booked later that evening.  At about 1:00 a.m., Ms. Cabactulan was placed in a cell with a thin raft-like mattress on the floor and given sheets and blankets that smelled unwashed.  (*Id*. ¶ 5.)  She asked to have a chair so she could

3669298

23

lift herself up and down but was refused. It took her 15 minutes to kneel down and lie on the mattress because of the pain she was in. Ms. Cabactulan was not provided any food that day. (*Id*.)

Since her arraignment, Ms. Cabactulan has been detained at MDC under cruel and inhumane conditions. She shares her two-person cell with one other person, and there is little to no room to move around. (Cabactulan Decl. ¶ 7.) Under MDC's COVID-19 policies, inmates are kept on lockdown in their cells for some 22 hours or more a day. (*Id*.) For brief increments of time lasting 30 minutes to an hour, called "Social Time," inmates are permitted to get hot water and ice, make calls, and check emails. There are only three computers available for use, and one is solely for discovery review. So the inmates have to line up to use them. There are days when the guards have not permitted Ms. Cabactulan's group to have Social Time. (*Id*.) On multiple occasions, the entire facility has been placed on total lockdown for weeks at a time. During those periods, inmates were locked in their cells all day, with no access to emails or phone calls, not even legal calls. (*Id*.)

In addition to the severe kidney and bladder infections that landed her in the emergency room on January 22, Ms. Cabactulan suffers from a number of chronic medical conditions that require regular medical treatment, including rheumatoid arthritis, asthma, obesity, hypothyroidism, high cholesterol, vertigo, hypertension and high blood pressure, high liver enzymes, and prediabetes-level high blood sugar. (See concurrently filed Declaration of Kate S. Shin in Support of Motion to Suppress Statement, Sealed Ex. F (Medical Records of Guia Cabactulan).) During the eight months she has been incarcerated at MDC, she has not received adequate care for these conditions and has been forced to suffer months of extreme pain before receiving treatment. Despite her serious medical condition, and apart from her initial medical exam upon arriving at MDC, she has only been allowed a visit to a physician as follows:

- On February 28, 2020, about a month into Ms. Cabactulan's

3669298

24

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

incarceration, a nurse sent her to the clinic after noticing that her weekly blood pressure reading was unusually high.  Ms. Cabactulan had previously put in a sick call request to see a doctor so she could get blood pressure medication and written approval to use her wheelchair, but this request had gone ignored until the alarming blood pressure reading.  In the examination room, Ms. Cabactulan began shivering and vomiting and almost fainted, so the staff called the doctor.  Two nurses came in with an EKG machine and medication to lower her blood pressure.  After that visit, she finally received approval for blood pressure medication and written approval for her wheelchair.  She later learned she had suffered from an asthma attack that day that was complicated by bronchitis.  She was also told she had an infection but was not told what kind.  (Cabactulan Decl. ¶ 9.)

- In late June, Ms. Cabactulan saw a doctor for symptoms of rheumatoid arthritis flare.  She had made a sick call request for treatment of these pain symptoms *two months prior*, but the request was ignored until the pain spread to the soles of her feet.  During the June visit, the doctor took several X-rays and claimed she had not told them she had rheumatoid arthritis, even though she had informed the medical staff of this previously.  The doctor said he could not prescribe her medication until MDC received medical records confirming her rheumatoid arthritis diagnosis, so she signed a release form to authorize him to obtain her prior medical records.  She was not prescribed any medication for the rheumatoid arthritis that day.  (*Id*. ¶ 10.)

By August, Ms. Cabactulan was still waiting to be prescribed medication for the rheumatoid arthritis symptoms she had been suffering for *four months*.  She asked a staff member if the doctor had received the medical records confirming her rheumatoid arthritis diagnosis yet, and two days later, the nurse asked her to sign the same release forms she had signed during the June visit.  (*Id*. ¶ 11.)  On August 22, 2020, Ms. Cabactulan woke up to sudden and extreme pain in her left knee, both of her hands, and wrists.  Her right hand was swollen and had no strength.  She grew scared that she would lose use of her hands and feet.  Only in September was she finally given a prescription for a steroid to treat her symptoms.  (*Id*. ¶ 12.)

In her prior experiences with rheumatoid arthritis flare, Ms. Cabactulan has had to see a doctor regularly to monitor her treatment, and she cannot get such monitoring at MDC.  (*Id*. ¶ 13.)  Indeed, when she first started taking the steroid as prescribed, her face grew red and swollen, and she experienced side effects of sweating, nausea, vomiting, and diarrhea, but she was not able to consult with anyone about whether the dosage was too high for several days.  She retrieves ice

and hot water during Social Time to mitigate these side effects, but on at least three occasions since she began taking the medication, the guards have canceled Social Time for her unit without warning or explanation, leaving her without access to these basic necessities. (*Id.*) She also has not received a follow up surgery for her January procedure on her kidney stones that should have been scheduled for May. (*Id.* ¶ 14.)

### C.    The Inhumane Detention of Marissa Duenas

Details regarding the detention conditions of Ms. Duenas are included in the "Cruel and Unusual Punishment" section of the Declaration of James D. Riddet in Support of Defendants' Joint Motion to Dismiss Indictment.

### D.    Severely Limited Access to Counsel

Due to the visiting and communication restrictions put in place as a result of the COVID-19 pandemic, it has been nearly impossible for defense counsel to meaningfully confer with Ms. Cabactulan. Over the summer, MDC went on total lockdown and suspended all in-person legal visits for an extended period of time. (Rim Decl. ¶ 3.) While MDC has since irregularly allowed in-person legal visits, Ms. Cabactulan has multiple health conditions that put her at high risk of severe illness or death if she should contract COVID-19.[10] (Rim Decl. ¶ 6.) Accordingly, counsel have requested legal calls and videoconferences, which are the only ways to communicate with those detained at MDC confidentially other than an in-person visit. It has been impossible to go over the more-than 180,000 pages and 175 gigabytes of discovery in this case with Ms. Cabactulan and Ms. Duenas through

---

[10]  The CDC website lists hypertension, asthma, obesity, diabetes, and chronic kidney disease as creating a heightened risk. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html

3669298

26

these limited communications.  (Decl. Rim ¶ 3.)

In the case of Ms. Cabactulan, counsel has only been able to speak to her confidentially six times in the past four months: one in-person visit on June 24, 2020, three brief legal calls, and two videoconferences on July 24 and September 14 respectively.  (Rim Decl. ¶¶ 3-5.)  Although defense counsel has requested videoconferences on at least seven occasions, nearly all have been later canceled by MDC (presumably because attorney visits are a lower priority than later scheduled court hearings for other cases).  (Rim Decl., Ex. B (cancellation notices for videoconferences originally scheduled for July 7, August 12, August 20, August 28, and September 3.) Apart from in-person visits, videoconferences are the only way that counsel can share and view documents with clients.  As to legal calls, MDC does not tell attorneys in advance when the call will happen, making it difficult to know when the call is coming and to schedule around that time.  Despite multiple requests for legal calls, defense counsel has only been able to speak to Ms. Cabactulan on the phone three times, sometimes only for 15 minutes.  (*Id*. ¶ 5.)

Details regarding the limited access Ms. Duenas has had to her counsel are included in the "Right to Counsel" section of the Declaration of James D. Riddet in Support of Defendants' Joint Motion to Dismiss Indictment.

## III.    THE INDICTMENT

On February 12, 2020, the Government obtained an Indictment against the Defendants charging a single conspiracy under 18 U.S.C. § 371 to commit violations of the Trafficking Victims Protection Act ("TVPA"), immigration fraud, and marriage fraud.[11]  According to the Indictment, this sprawling, multi-object conspiracy existed from May 2010 through January 2020.  (Dkt. 41 ("Indict.") ¶ 12.)

---

[11]  The specific underlying offenses alleged are 18 U.S.C. § 1570(a) (Trafficking with Respect to Forced Labor), 18 U.S.C. § 1592(a)(3) (Document Servitude), 18 U.S.C. § 1546(a) (Immigration Fraud), and 8 U.S.C. § 1325(c) (Marriage Fraud).

3669298

27

The Indictment acknowledges the Kingdom is a church (Indict. ¶ 1) and describes each Defendant's alleged role in the church.  (*Id*. ¶ 6.) The Indictment targets conduct that is central to the Church's ecclesiastical governance of Miracle Workers, including allegations pertaining to fundraising requirements, assigning Miracle Workers to missionary positions in the United States, requiring Miracle Workers to marry within the Church, and the imposition of church discipline.  (*Id*. ¶¶ 13-14).

The Defendants are accused of recruiting "volunteers" to the United States by helping to arrange travel visas for them and making them solicit donations for the Church upon arrival.  The Indictment clearly states that these "'volunteers' were referred to as Full Time Workers," but does not explain what a Full Time Miracle Worker is.  (*Id*. ¶13f.)  The Defendants are accused of forcing these Miracle Workers to stay in the United States and continue raising funds by "confiscating" their passports,[12] making some obtain student visas, and making others enter into sham marriages.  The Miracle Workers were allegedly forced to work long hours and live in compounds "under poor conditions."  (*Id*. ¶ 13f-g.)  When they failed to meet fundraising "quotas," the Miracle Workers were allegedly "punished by KOJC administrators, including defendant ESTOPARE, by being yelled at, shamed, berated, physically abused, or forced to fast, i.e., abstain from food, while being locked in a room at the KOJC compound."  (*Id*. ¶ 13i.)[13]  While the Indictment alleges that unidentified Church leaders led lavish lifestyles, it does not allege that any of the Defendants led such lifestyles—indeed, the Defendants are alleged to have lived in the same Van Nuys compound in "shared rooms and under poor

---

[12]   Notably, the Indictment vaguely alleges only that these were "taken" or "confiscated" but provides no specifics as to how holding these passports supposedly *forced people to work.*

[13]   Only Ms. Estopare, who is out on bond, is alleged to have engaged directly in physical abuse.

3669298

28

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

conditions" alongside the other Miracle Workers they supposedly victimized. (*Id.* ¶¶ 6, 13g.) The Indictment is clear that the Defendants were acting for the benefit of the Church and includes no allegations that they were acting for personal gain.

Apart from alleging that each Defendant is an "administrator" for the Church, the Indictment contains virtually no specific allegations as to the who, what, where, when, and why the Defendants came to an agreement to do something unlawful. (*Id.* ¶ 6.) The Indictment makes reference to unidentified "KOJC administrators" throughout and uses the conspiracy count to hold the Defendants individually accountable for allegations against the entire religious institution of the Kingdom itself as a whole. Nor does the Indictment specify which factual allegations relate to which of the four substantive violations alleged as the objects of the conspiracy. The most specific facts are alleged in the "Overt Acts" portion of Indictment, which lists dates and refers to actual actions taken by the Defendants. (*Id.* ¶ 14.) These allegations include "confiscating" the passports of Miracle Workers under unspecified circumstances, sending emails regarding travel arrangements for Miracle Workers, sending emails regarding fundraising goals and requirements, paying for the college tuition of some Miracle Workers, paying for and assisting in the completion of marriage paperwork, and arranging for Miracle Workers to marry. (*Id.*)

Critically, the Indictment is missing the most inflammatory allegations from the Complaint that were used to justify the detention of Ms. Cabactulan and Ms. Duenas. There is no reference to the sexual abuse allegations against the Pastor, any threats to the safety of cooperators who left the Kingdom, or anyone being made to shave their head. The Indictment does not connect the Defendants to any of those allegations.

## IV.   THE FIRST AMENDMENT AND RFRA REQUIRE DISMISSAL OF THE INDICTMENT

The First Amendment provides that "Congress shall make no law respecting

3669298

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.  The Supreme Court has long interpreted the First Amendment's Religion Clauses as prohibiting government interference into matters that concern "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them."  *Watson v. Jones*, 80 U.S. 679, 733 (1871).  An indictment that applies a criminal statute in violation of the First Amendment's Free Exercise or Establishment Clauses fails to state an offense and must be dismissed.  *See United States v. Boyll*, 774 F. Supp. 1333, 1339-42 (D.N.M. 1991) (granting defendant's motion to dismiss the indictment as violating his First Amendment right to freely exercise his religion); Fed. R. Crim. P. 12(b)(3)(B)(v); *see also United States v. Cerullo*, No. CRIM. 05CR1190BEN, 2007 WL 2683799, at *4 (S.D. Cal. Sept. 7, 2007) (dismissing the indictment against a clergyman on the grounds that the prosecution failed to exercise "great care" during the grand jury proceedings as is required where the government attempts to convert the "rights afforded by the Free Exercise Clause … into a federal crime").

In determining whether the application of a statute violates the Free Exercise Clause, courts must weigh three factors: "(1) the magnitude of the statute's impact upon the exercise of the religious belief, (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state."  *Werft v. Desert Sw. Annual Conference of United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004).  Even where there is a showing of a compelling state interest, the application of some statutes "may still have such an adverse impact on religious liberty as to render judicial review of a Church's compliance with the statute a violation of the Free Exercise Clause."  *Id.*  In such cases, "the burden on religious liberty is simply too great to be permissible."  *Id*.

In determining whether a statute implicates the Establishment Clause, courts have applied the *Lemon* test[14] articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971): (1) whether the statute has a secular legislative purpose, (2) whether its principal or primary effect advances or inhibits religion, and (3) whether it fosters an excessive government entanglement with religion. *See Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940, 948 (9th Cir. 1999); *Claire Headley v. Church of Scientology Int'l*, No. CV 09-3987 DSF MAN, 2010 WL 3184389, at *4 (C.D. Cal. Aug. 5, 2010), *aff'd,* 687 F.3d 1173 (9th Cir. 2012). The *Lemon* test is not a balancing test—each factor is mandatory. *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1017 (9th Cir. 2010) (all three prongs of the Lemon test must be satisfied in order for a school district's policy requiring recitation of the Pledge of Allegiance to be constitutional under the Establishment Clause). If the state's application of a statute fails to meet any one of these factors, the state has violated the Establishment Clause.

Separately, the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.,* prohibits the federal government from substantially burdening a person's exercise of religion, "even if the burden results from a rule of general applicability." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006). If a criminal prosecution substantially burdens a defendant's exercise of religion, RFRA requires courts to apply strict scrutiny: to "demonstrat[e] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of

---

[14]  The Supreme Court recently rejected the relevancy of the *Lemon* test in the context of considering whether religious symbols that have historical significance may remain on public lands under the Establishment Clause. *See Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2088-89 (2019). The Court did not overrule the *Lemon* test, however, and the issues in this case do not relate to religious symbols of historical significance. Thus, the *Lemon* test applies.

3669298

31

furthering that compelling governmental interest." *Id*; 42 U.S.C § 2000bb–1(b). "A person whose religious practices are burdened in violation of RFRA 'may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.'" *Gonzales*, 546 U.S. at 424; 42 U.S.C § 2000bb–1(c).

The Indictment in this case must be dismissed under the Free Exercise Clause, the Establishment Clause, and RFRA. Because the three doctrines have overlapping requirements, Defendants analyze them in conjunction. First, there can be no reasonable dispute that the burden which this prosecution places on Church and on the ability of the Defendants to practice their religion is substantial. Second, the conduct alleged in the Indictment is protected by First Amendment's "ministerial exception." In fact, this Court has applied the ministerial exception in two cases involving facts *nearly identical to those alleged in the Indictment* and found that a religious organization cannot be held civilly liable under the TVPA by former members of its order. The ministerial exception prohibits prosecution under all three doctrines. Third, the Government cannot demonstrate that it has a compelling interest in prosecuting conduct that has long been held by the Supreme Court as being protected by the First Amendment.

**A.     The Indictment Imposes a Substantial Burden on the Exercise of Religion**

The Indictment's imposition on the exercise of religion cannot be reasonably disputed. The Government has made no secret of its intentions to bring down the entire religious institution of the Kingdom itself through its prosecution of the Defendants. It has loudly and repeatedly characterized the Kingdom as a "human-trafficking ring" while obscuring the fact that the alleged victims in the Indictment were Miracle Workers who had agreed to abide by the rules of the Kingdom's religious order. This significant omission prompted Judge Carney to find that the charges in this case "pose an existential threat to KOJC." (Dkt. 39 at 5.) There is therefore already a finding in this case that the Government's prosecution threatens

3669298

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

to annihilate the Kingdom as a religion.

B.    The First Amendment's "Ministerial Exception" Bars Prosecution Of This Case Because Miracle Workers Are Part of the Church's Religious Order

The First Amendment's Religion Clauses do not shield the average lay person from laws of general applicability on the sole ground that the alleged conduct was religiously motivated.  However, when it comes to church employees whose "duties relate to the 'core of the mission' of the religious organization," the Supreme Court has long-recognized a "ministerial exception" that prohibits any branch of the government—be it executive, legislative, or judicial—from interfering with a religious institution's management of such employees.  *See Morrissey-Berru*, 140 S. Ct. at 2064; *see also Hosanna-Tabor v. EEOC*, 565 U.S. 171, 186-89 (2012); *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976); *Kedroff*, 344 U.S. at 115-16.  That is because state intrusion into the way a religion manages *members of its religious order* burdens not only the religious practices of one individual but of the religion as a whole.  "The First Amendment has erected a wall between church and state.  That wall must be kept high and impregnable.  We could not approve the slightest breach."  *Everson v. Bd. of Educ.,* 330 U.S. 1, 18 (1947).

The ministerial exception derives from both the Free Exercise and Establishment Clauses of the First Amendment.  *Werft*, 377 F.3d at 1101.  It "relates to the broader relationship between an organized religious institution and its clergy, termed the 'lifeblood' of the religious institution."  *Id*.  "Matters *touching* this relationship must necessarily be recognized as of prime ecclesiastical concern." *Id*. at 1103 (quoting *McClure v. Salvation Army*, 460 F.2d 553, 559 (5th Cir. 1972)). Matters that fall under the ministerial exception include a "minister's working conditions" and any part of the "minister's employment relationship with the church."  *Id.*  The fact that the church's administration of its workers is harsh

3669298

33

enough to share certain characteristics of human trafficking does not make it actionable under the TVPA. *See Marc Headley*, 2010 WL 3157064, at \*5; *Claire Headley*, 2010 WL 3184389, at \*5-6 (ministerial exception barred civil claims under TVPA based on allegations including "forced abortion," restrictions on leaving, censorship, discipline, and manual labor required of members of the Sea Org religious order). While the ministerial exception was first applied in the context of employment discrimination statutes, neither its doctrinal background nor rationale is limited to discrimination or labor-related claims, but rather applies to "any federal or state cause of action." *Werft*, 377 F.3d at 1100 n.1.

The cases brought by Marc and Claire Headley against the Church of Scientology are particularly instructive here. The Headleys sued the Church of Scientology under the TVPA, the same statute alleged as one of the criminal objects of the conspiracy in this case, for suffering they endured as members of the Sea Organization ("Sea Org"), "an elite religious order" that "acts as Scientology's evangelical wing." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1174 (9th Cir. 2012). "The Sea Org demands much of its members, renders strict discipline, imposes stringent ethical and lifestyle constraints, and goes to great efforts to retain clergy and to preserve the integrity of the ministry." *Id.* The record reflected the following facts regarding the Headley's time as members of the Sea Org:

- <u>Required labor</u>. They were required to work more than 100 hours a week, while the Church paid their living expenses and provided them each with a $50 weekly stipend. *Id*. at 1176.

- <u>Rules of obedience</u>. The Church imposed strict constraints on outside communication and censored their mail, monitored their phone calls, and required them to obtain permission to access the Internet. *Id*.

- <u>Discipline</u>. The Church imposed discipline in the form of "verbal warnings or rebukes, loss of privileges, removal from a post, diminution of responsibilities, manual labor, or expulsion. Sea Org members also participate in religious training and practices, including 'confessionals.' In a confessional, a member confesses transgressions and may then be absolved or disciplined." *Id*.

3669298

34

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

- <u>Extreme Discipline</u>.  As a form of discipline for problems with his work, Marc was once required to "hand-clean dried human excrement from a large aeration pond" for two days.  For six- to eight-month disciplinary period, Claire was denied dining hall privileges, was forced to subsist on protein bars and water, and lost about thirty pounds.  *Id*. at 1176.  On several occasions, they were physically abused.  *Id*.

- <u>Restrictive Marriage Policy</u>.  The Sea Org had strict marriage policies and were only allowed to marry within the Sea Org.  *Id*. at 1175-76.  They attempted to force Claire to divorce Marc.  *Id*.

- <u>Forced Abortions</u>.  The Sea Org did not allow its members to have children while in the ministry because the member could be asked to serve anywhere in the world at a moment's notice.  *Id*. at 1175.  Claire got pregnant twice and was forced to have abortions under this rule under threat of manual labor.  *Id*. at 1176.

- <u>Leaving and Shunning</u>.  The Sea Org allowed members who wished to return to a normal life to formally apply to "leave the ministry" through a process called 'routing out.'"  *Id*. at 1175.  Routing out allowed a member to remain a Scientologist in good standing.  Leaving without formally routing out was greatly discouraged.  Other members would try to locate that member and attempt to persuade him to return to the Sea Org, which they believed was "integral to their efforts to clear the planet and to help their members (even departed ones) achieve salvation."  A member who absconds in this manner might be declared a "suppressive person," which is akin to being excommunicated or shunned, and can cause such members to lose contact with Scientologist family or friends.  *Id*.

At the district court level, in two opinions by Judge Dale S. Fischer, this Court granted summary judgment in favor of the Church of Scientology as to the Headleys' TVPA claims.  The Court held that "Plaintiff's TVPA claim cannot be grounded on conduct shielded from judicial scrutiny by the ministerial exception." *Claire Headley*, 2010 WL 3184389, at *5; *Marc Headley*, 2010 WL 3157064, at *5. In applying the ministerial exception, the Court found that "[i]n order to determine whether Defendant's means of persuading members to remain with the Sea Org, etc. fall within the purview of the TVPA, a trier of fact must inquire into Scientology's policies, practices, and scriptures," *Marc Headley*, 2010 WL 3157064 at *6.  The Court further observed that "[d]etermining whether Scientology's practices of routing out, censorship, or heavy manual labor as a form of discipline, for example, constitute involuntary servitude within the meaning of the TVPA is precisely the type of entanglement that the Religion Clauses prohibit." *Claire Headley*, 2010 WL

35

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

3184389 at *6.

The Ninth Circuit affirmed both decisions on separate grounds, finding that the factual record as summarized above simply failed to meet the elements of the TVPA statute. *Headley v. Church of Scientology Intern.*, 687 F.3d at 1179-81. While the Ninth Circuit did not reach the issue of whether the District Judge had correctly applied the ministerial exception, it did observe as follows:

> The district court was right to recognize that courts may not scrutinize many aspects of the minister-church relationship. … Here, moreover, the defendants maintain that the vast majority of the conduct on which the Headleys' claims rest—stringent lifestyle constraints, assignment to manual labor, strict discipline, the requirement to leave the ministry only by routing out, efforts to retain ministers, and the practice of declaring some departed members 'suppressive persons'—is religiously motivated or otherwise protected. But because the Headleys have not established a genuine issue of material fact regarding whether the defendants obtained their labor "by means of" improper conduct, we need not reach the question of whether the ministerial exception would bar a claim under the Act. And because we need not reach any constitutional issues, we also need not decide whether the Act would have to be given a limiting construction to avoid constitutional problems. *Id.* at 1181.

The *Headley* cases are squarely on point. The Indictment is premised on the Kingdom's treatment of Full Time Miracle Workers who hold a special position in the Church's religious order. (*See* Indict. ¶ 13f [alleging that the KOJC workers who are the subject of the Indictment were "referred to as Full Time Workers, or 'FTWs'"].) As a threshold matter, the ministerial exception clearly applies to them. The term "minister" applies to any church worker whose "duties relate to the 'core of the mission' of the religious organization." *Morrissey-Berru*, 140 S. Ct. at 2064. *See e.g., Hosanna-Tabor*, 565 U.S. at 192 (applying the ministerial exception to a teacher at a Lutheran school who taught six secular classes, but who accepted a religious "call" and taught one religious course daily); *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288, 1292-93 (9th Cir. 2010) (rejecting "a strained reading" of the ministerial exception, holding that a seminarian trainee who was hired to do secular maintenance tasks nevertheless fell within the exception). Under these principles that have been consistently advocated by the Supreme Court,

3669298

36

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

there is no question that the Church's relationship with the Miracle Workers falls within the ministerial exception. *See Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1168-69 (4th Cir. 1985) (ministerial exception applies where the church member's "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship," or "is important to the spiritual and pastoral mission of the church.); *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 703 (7th Cir. 2003) (applying exception to non-ordained press secretary whose duties included outreach to community); *Ross v. Metro. Church of God*, 471 F. Supp. 2d 1306, 1310 (N.D. Ga. 2007) (collecting cases applying exception to musical director, organist, choir director, resident in hospital pastoral program, religion teacher at parochial school, nun, kosher food supervisor, and director of religious education).

Like Sea Org members, Miracle Workers are required to "work long hours without material compensation, to live communally, to adhere to strict ethical standards, and to be subject to firm discipline for ethical transgressions." *See Headley*, 687 F.3d at 1174-75. Although the Defendants vehemently deny the accuracy of the allegations in the Indictment, even assuming the worst of them are true, the allegations are far less severe and vaguer than the concrete allegations of psychological coercion and physical abuse that were deemed protected by the ministerial exception in the *Headley* cases:

- <u>Required labor</u>. Some Miracle Workers were allegedly required to work "nearly every day, year-round, working very long hours, and often sleeping in cars overnight, without normal access to over-the-counter medicine or even clothes." (Indict. ¶ 13d.)

- <u>Rules of obedience</u>. The Kingdom allegedly kept control over the passports of Miracle Workers and would only permit access with permission. (*Id*. ¶ 13a.) The Kingdom also imposed quotas on the amount of funds that had to be raised. (*Id*. ¶ 13i.) The Kingdom sent some Miracle Workers to college and paid for their education. (*Id*. ¶ 13o.)

- <u>Discipline</u>. Miracle Workers were sometimes allegedly yelled at,

shamed, berated, physically abused, or forced to fast, i.e., abstain from food, (*Id*. ¶ 13i.)

- <u>Restrictive Marriage Policy</u>. The Kingdom allegedly required some Miracle Workers to marry other Miracle Workers. (*Id*. ¶ 13l.)

- <u>Leaving and Shunning</u>. Ms. Duenas allegedly kept a file titled "Traitor" containing information on Kingdom members who had "fled." (*Id*. ¶ 14, p. 15, Overt Act 23.)

These allegations fall squarely within matters of ecclesiastical governance that must remain free from any kind of state intrusion under the ministerial exception.

**C.    The Government Has No Compelling Interest In Prosecuting Conduct That Is Protected By the Ministerial Exception**

When it comes to interfering with the internal affairs of a religious order, the Government cannot show a compelling interest that could outweigh the enormous burden placed on the free exercise of the religion. *See Werft*, 377 F.3d at 1102 ("some religious interests are so strong that no compelling state interest can justify government intrusion") (*quoting Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 713 (1976)). Nor is the Government relieved of its burden to demonstrate a compelling interest just because the statute they use to violate the ministerial exception is criminal. The Supreme Court has held that, when it comes to criminal prosecutions, RFRA's "compelling interest test" requires the Government to engage in a "more focused inquiry" that goes beyond merely reciting the general societal harms that a criminal statute aims to prevent. *See Gonzales*, 546 U.S. at 432. In *Gonzales*, the Court affirmed a preliminary injunction enjoining the federal government from prosecuting members of "a Christian Spiritist sect based in Brazil, with an American branch of approximately 130 individuals" for using a hallucinogen that was banned by the Controlled Substance Act. *Id*. at 425. The Government cited a compelling interest in "protecting the health and safety of UDV members, preventing the diversion of *hoasca* from the church to recreational users, and complying with the 1971 United Nations Convention on Psychotropic Substances." *Id*. at 426. The district court, the Tenth Circuit, and the Supreme

3669298

38

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

Court found all of these reasons insufficient to satisfy RFRA's compelling-interest test. *Id*. at 426-27. RFRA requires courts to look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id*. at 431.

Here, the compelling interest inquiry is simple: the Government cannot demonstrate a compelling interest in interfering with matters of ecclesiastical concern, which is expressly prohibited by the Constitution. There is even less of a compelling interest in pursuing the Indictment in this case where nearly identical facts have already been found by a court to be protected conduct under the ministerial exception. *See Marc Headley,* 2010 WL 3157064, at *5; *Claire Headley*, 2010 WL 3184389, at *5-6. Nor can the Government demonstrate that treating an entire religion as a "human-trafficking ring" is the least restrictive means of achieving its objectives.

Moreover, allowing the Indictment to stand would render most churches and religious communities vulnerable to similar charges on the whim of prosecutors and in response to public disapproval. The Government's allegations concerning the so-called victims, even if true, are not atypical of the life of religious orders in other faiths. Under the First Amendment, the lifestyle constraints and disciplinary practices, such as fasting, required of ministers of a religious order are beyond the scrutiny of the courts. *See Meroni v. Holy Spirit Ass'n for Unification of World Christianity*, 119 A.D.2d 200, 205-06 (1986) (in dismissing a tort action brought by the estate of a former member of the Unification Church who committed suicide, the court observed that intense fasting and isolation from outside world are common means of indoctrination); *Lewis v. Holy Spirit Ass'n for Unification of World Christianity*, 589 F. Supp. 10, 12 (D. Mass. 1983) (indoctrination and initiation procedures and conditions of membership in a religious organization are generally not subject to judicial review); *Paul v. Watchtower Bible & Tract Soc. of New York,*

3669298

39

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

*Inc.*, 819 F.2d 875, 883 (9th Cir. 1987) ("Churches are afforded great latitude when they impose discipline on members or former members."). In this respect, the Church workers, including those labelled "victims" by the government's actions, are no different than those individuals throughout history who commit themselves to a life of religious service—such as monks, nuns, priests, and the like. These religious workers often live in isolated abbeys, convents, and monasteries, and pursuant to vows of poverty, abstinence, abnegation, isolation, or even silence. All such individuals face the possibility that their commitment will not remain steady and firm, and that they may become disillusioned or disappointed by their church. If they change their minds, they risk being cast into a secular world with which they are unfamiliar, for which they are untrained, and in which they may be alone. Such individuals, under our system of religious freedom, have a right to make such a choice and to assume such a risk. All churches have a right to accept and rely upon such a commitment.

> ### D. The First Amendment and RFRA Violations Infect the Entire Indictment

In an effort to hold the Defendants accountable for the Church's general practices, as imagined by the Government, the Indictment charges a single conspiracy count alleging criminal actions against Miracle Workers in furtherance of human trafficking crimes, immigration fraud, and marriage fraud. To the extent that the Indictment contains any allegations that might not warrant First Amendment protection, the jumbled nature of the conspiracy charge makes it impossible to separate those from the allegations that *are* constitutionally protected. Thus, the First Amendment violation requires dismissal of the entire Indictment.

"In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation," and a defendant may be charged based only on matters actually presented to the grand jury. U.S. CONST. amends. V, VI. The Federal Rules implement these guarantees by requiring an

3669298

40

indictment to set forth "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Pursuant to Rule 12, a defective indictment must be dismissed if it fails to allege a crime on its face with specificity, taking into account statutory elements and constitutional requirements. Fed. R. Crim. P. 12(b)(3)(A)-(B); *Wayte v. United States*, 470 U.S. 598, 608 (1985) ("[T]he decision to prosecute may not be 'deliberately based upon an unjustifiable standard' ... including the exercise of protected statutory and constitutional rights."); *United States v. Buddenberg*, No. CR-09-00263 RMW, 2010 WL 2735547, at *10 (N.D. Cal. July 12, 2010) (dismissing the indictment where it fails to allege the facts of the crime with sufficient specificity to meet the constitutional requirements).  Where charges have First Amendment implications, as they do here, the government must "more specifically identify the precise conduct" alleged to fall outside constitutional protection.  *Buddenberg*, 2010 WL 2735547, at *9.

The Indictment falls far short of the specificity necessary to determine what allegations if any could fall outside of the ministerial exception.  Paragraph 13 in particular spans pages 5-11 and broadly alleges that the Defendants and "other known and unknown to the Grand Jury" engaged in criminal conduct against Miracle Workers.  In sum, the Indictment alleges that the Defendants made travel arrangements for Miracle Workers to come to the United States, took their passports when they arrived at the compound, lived with them communally at the compound, required them to fundraise, imposed fundraising goals, sent funds back to the Philippines, enrolled Miracle Workers in colleges, arranged marriages for some, made them work long hours without pay, and imposed discipline for poor work performance.  (Indict. ¶ 13.)  Language from the TVPA is sprinkled throughout the allegations.  Paragraph 14 then lists a series of Overt Acts, many of which are past the statute of limitations, that are vague and insufficient on their own to allege a crime.  For example, in Overt Act No. 4, on October 24, 2014, Ms. Estopare is

accused of "sending an email titled 'format' containing a Microsoft Excel spreadsheet for KOJC workers to report the amount of money raised." (Indict. ¶ 14, p. 12.) On Overt Act No. 15, on June 26, 2018, Ms. Cabactulan is accused of "using a bank account in the name of 'The Executive Pastor of the Kingdom of Jesus Christ TNAEN,' and paying $2,450 to California University of Business and Technology for 'Praya tuition fee.'" (Indict. ¶ 14, p. 14.) The Indictment does not specify which of the factual allegations are related to which underlying substantive offense.

Most if not all of the conduct alleged in the Indictment clearly falls within the ministerial exception. To the extent that any allegation falls outside of protected religious conduct, it is impossible to discern what those allegations are, and more importantly, whether the Grand Jury indicted based on that evidence or on evidence of protected conduct. Given the tendency for the ecclesiastical disciplinary practices of any religion to seem harsh by secular standards, it is highly likely that the Grand Jury was substantially influenced by such evidence. This defect is fatal to the entire Indictment, which must at minimum "ensure that the defendant is prosecuted on the basis of facts presented to the grand jury." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979).

## V. AS TO MS. CABACTULAN AND MS. DUENAS, THE INDICTMENT MUST BE DISMISSED PURSUANT TO THE COURT'S SUPERVISORY POWERS FOR VIOLATION OF THEIR FIFTH AND SIXTH AMENDMENT RIGHTS

The Court must dismiss the Indictment as to Ms. Cabactulan and Ms. Duenas on the independent basis that the inhumane and restrictive conditions of their eight-month detention at MDC have risen to the level of constitutional violations. District courts have the inherent authority to dismiss an indictment pursuant to their supervisory powers "when the investigatory or prosecutorial process has violated a federal constitutional or statutory right and no lesser remedial action is available." *United States v. Barrera-Moreno,* 951 F.2d 1089, 1092 (9th Cir.1991).

3669298

42

These supervisory powers include the ability "to implement a remedy for a violation of recognized rights." *United States v. W.R. Grace*, 526 F.3d 499, 511 n. 9 (9th Cir. 2008) (citation omitted). Even when government conduct does not rise to the level of a due process violation, a court nonetheless may dismiss an indictment using its supervisory powers "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct" by the Government. *United States v. Stinson*, 647 F.3d 1196, 1210 (9th Cir. 2011) (*quoting Barrera-Moreno,* 951 F.2d at 1091).

Where the prosecution of a defendant by one component of the Executive Branch (the USAO) results in the unconstitutional detention of that person by another component of the Executive Branch (MDC), the Government must choose between abandoning the prosecution or releasing the defendant from her unconstitutional confinement. *See United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167, 1170 (D. Or. 2012) (where pretrial detention in ICE custody deprived a criminal defendant of Fifth and Sixth Amendment right to due process and counsel, constitution required the government either to abandon the prosecution or to release the defendant on bail). If it fails to make that choice, the Court must dismiss the case pursuant to its supervisory powers. *Id.* at 1180-81. Such dismissal is warranted here. Both the United States Attorney's Office and the MDC are overseen by the Department of Justice, an arm of the Executive Branch. The USAO has brought criminal charges against Ms. Cabactulan and Ms. Duenas that have resulted in their detention, and MDC is detaining them under conditions that are in gross violation of their constitutional rights under the Fifth, Eighth, and Sixth Amendments. Thus, as was the case in *Trujillo-Alvarez*, the Executive Branch must make a choice: abandon prosecution, or release them from their unconstitutional conditions of confinement. If the Government is not willing to make that choice, the Court must dismiss the Indictment pursuant to its supervisory powers to remedy the

3669298

43

constitutional violations and to deter the Government from future violations. *See id.* at 1181 (indictment must be dismissed with prejudice if government has not released defendant on bond within one week).

**A.      Inadequate Medical Care, Cruel Lockdown Conditions, and Length of Detention Amount to Unconstitutional Punishment of Pretrial Detainees In Violation of the Fifth and Eighth Amendments**

The Fifth Amendment Due Process Clause prohibits punishment of detained persons prior to "a formal adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-72 (1946)).  The government violates a detained person's rights if the conditions of confinement amount to punishment. *Doe v. Kelly*, 878 F.3d 710, 720 (9th Cir. 2017).  Where, as here, the detention is of pretrial detainees who are presumed innocent, the Supreme Court has held that "due process rights . . . are *at least* as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (emphasis added).  Consequently, the Ninth Circuit recognizes that, where an individual's rights arise under the Due Process Clause, the guarantees of the Eighth Amendment against cruel and unusual punishment "provide a *minimum standard of care* for determining their rights, including the rights to medical and psychiatric care." *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003) (emphasis original).

The Eighth Amendment prevention against cruel and unusual punishment imposes an affirmative duty on the government to "provide humane conditions of confinement," including by providing for incarcerated persons' reasonable safety and by addressing their serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 828, 832-33 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (requiring corrections officials to address prisoners' serious medical needs).  The government violates this obligation when it takes a person into its custody but "fails to provide

for [their] basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cty. Dep't. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). To establish a violation of this duty, Plaintiffs must establish that the government acted with "deliberate indifference" to a substantial risk of serious harm. *Farmer*, 511 U.S. at 828. To succeed on a Fifth Amendment claim regarding inadequate medical care, a pretrial detainee must demonstrate "an intentional decision" regarding conditions that puts detained persons at "substantial risk of suffering serious harm" and a failure to "take reasonable available measures to abate that risk." *See Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). This does not require a showing of subjective intent to harm but rather rises to the level of "something akin to reckless disregard," *Id*. at 1125 (*quoting Castro v. Cty. Of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)). With respect to medical care specifically, due process dictates that "persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs." *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (*quoting Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996)) (internal quotation marks omitted) (overruled on other grounds by *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016)). Thus, the Constitution requires that prisons provide access to medical staff who are able to treat prisoners' medical problems or arrange for "reasonably speedy" treatment at an outside facility. *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

As to Ms. Cabactulan, the facts in this case go far beyond mere punishment and are more than sufficient to meet the cruel and unusual deliberate indifference standard. Since Ms. Cabactulan's arrest on January 29, 2020, jail officials have repeatedly demonstrated callous indifference to her medical needs. Upon her admission, they accused her of lying about her recent kidney surgery, and even though they knew she was on antibiotics, they did not provide her with food for over

3669298

45

24 hours.[15] (Cabactulan Decl. ¶¶ 4-5.) They ignored her request for a chair to help her lie down on the thin air mattress, and she spent 15 minutes suffering through excruciating pain just to lie down. (*Id*.) Upon her transfer to MDC, her sick call requests were ignored, and she went without her blood pressure medication for a month. (*Id*. ¶¶ 8-9.) She was reprimanded and threatened for using a wheelchair to help with her arthritic pain and mobility issues. (*Id*.) It was not until her blood pressure reading was alarmingly high that she was taken to see a doctor and finally provided blood pressure medication and authorization to keep the wheelchair. (*Id*.)

When she began experiencing knuckle and joint pain from her rheumatoid arthritis in late April, her sick call requests were again ignored. (*Id*. ¶ 10) She was not able to see a doctor until late June, nearly two months later. (*Id*.) Instead of having her evaluated by a rheumatologist, MDC refused to give her a prescription to treat her arthritis symptoms until they received medical records from an outside hospital and made her sign release forms. (*Id*.) They then either forgot to send or lost her release forms and made her re-sign them in late August. (*Id*. ¶ 11.) At that time, the only remedies she had for her pain were painkillers from the commissary and hot compresses when hot water was available to her. (*Id*.) She did not get medication for her rheumatoid arthritis until September, more than *four months* after she began experiencing the painful symptoms of a flare-up. (*Id*. ¶ 12.) By that point, her right hand was so swollen, and she was in so much pain, that she was afraid she would lose the use of her hand. (*Id*.) To force a 60-year-old woman with chronic health conditions to suffer pain for over four months and to refuse to treat her until her symptoms until they were close to the point no return amounts to cruel and unusual punishment. *See Jett v. Penner*, 439 F.3d 1091, 1096-98 (9th Cir.

---

[15] Ms. Cabactulan's medical records from the kidney surgery show that she was scheduled for a follow-up surgery in May, which has not yet occurred during her time at MDC.

2006) (delay of treatment for serious medical need can amount to deliberate indifference if the delay leads to further injury or unnecessary pain).

Aside from the inadequate medical care, the length of detention under punitive lockdown conditions alone amounts to a due process violation. Even before the COVID-19 pandemic, courts had found that lengthy periods of detention could rise to the level of a due process violation. *See*, *e.g.*, *United States v. Babichenko*, No. 1:18-CR-00258-BLW, 2019 WL 3558484, at *12 (D. Idaho Aug. 5, 2019) (detention of defendant for more than 11 months had turned punitive and required release on bond). Here, Ms. Cabactulan and Ms. Duenas have been incarcerated for eight months, and due to MDC's modified pandemic policies, during that time they have been locked in their cell for at least 22 hours a day. On more than one occasion, MDC has gone on total lockdown for two week periods, where they are not allowed to leave their cells at all. (Cabactulan Decl. ¶ 7.) During those periods, Ms. Cabactulan cannot get access to ice and hot water, basic necessities for anyone but especially for someone who has been given no other means to manage her arthritic pain for four months. (*Id*. ¶¶ 7, 13.) Ms. Cabactulan has multiple conditions that put her at increased risk of severe illness or death from COVID-19, including her hypertension, asthma, obesity, pre-diabetes, kidney issues, and now her use of prednisone for her rheumatoid arthritis, which is a corticosteroid. Given her age and chronic health conditions, keeping her detained for more than eight months during a life-threatening pandemic rises to the level of a punishment in violation of her due process rights.

As to Ms. Duenas, facts pertaining to her jail conditions are described in the "Cruel and Unusual Punishment" section of the Declaration of James D. Riddet in Support of Defendants' Joint Motion to Dismiss Indictment.

**B.      Lack of Regular Access to Confidential, In-Person Legal Visits or Videoconferences Violates the Sixth Amendment Right to Counsel**

The punitive nature of Ms. Cabactulan and Ms. Duenas's detention is further

exacerbated by their lack of access to counsel, which has prevented them from assisting in the preparation of their defense and threatens to interfere with their right to a Speedy Trial.  The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defense." U.S. Const. amend. VI. "[A]n inmate's opportunity to confer with counsel is a particularly important constitutional right which the courts will not permit to be unnecessarily abridged."  *Dreher v. Sielaff*, 636 F.2d 1141, 1146 (7th Cir. 1980). This right attaches when a prosecution is commenced.  *See Texas v. Cobb*, 532 U.S. 162, 176 (2001).  "The core of this right has historically been, and remains today, 'the opportunity for a defendant to consult with an attorney and have him investigate the case and prepare a defense for trial.'" *Kansas v. Ventris*, 556 U.S. 586, 590 (2009) (citing *Michigan v. Harvey*, 494 U.S. 344, 348 (1990)).

As the Supreme Court has acknowledged, "the Sixth Amendment's assistance-of-counsel guarantee can be meaningfully implemented only if a criminal defendant knows that his communications with his attorney are private and that his lawful preparations for trial are secure against intrusion by the government, his adversary in the criminal proceeding. . . ." *Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977).  Absent guarantees of confidentiality "the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice." *Fisher v. United States*, 425 U.S. 391, 403 (1976).  The assistance of counsel depends on "full and frank communication between attorneys and clients" and "can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

The Government has investigated this case for years and produced more than 180,000 pages and 175 gigabytes of discovery.  (Rim Decl. ¶ 3.)  As to Ms. Cabactulan, it has been impossible to make meaningful progress reviewing the discovery during the pandemic.  The only way for counsel to have confidential

3669298

48

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

communications with Ms. Cabactulan is through an in-person legal visit, a video conference, or a legal call.  Of those, only two—an in-person visit and a video conference—allow counsel to share and review documents with her.  (Rim Decl. ¶ 4.)  The in-person visit is not an option—not only has MDC has been closed to legal visits for weeks at a time, but even when legal visits are permitted, counsel cannot risk exposing Ms. Cabactulan to COVID-19, given her numerous health conditions and the total lack of medical care that is available to her inside.  (Rim Decl. ¶ 6.)  As for videoconferences, only two out of seven videoconferences have gone forward, with the other five being canceled at the last minute.  (Rim Decl., Ex. B.)  Because the video calls take a week or two to schedule, a canceled video conference session can result in a four-week delay between the last video conference and the next one getting the next one scheduled.  (Rim Decl. ¶ 4.)  Counsel for Ms. Duenas have encountered similar difficulties communicating with their client, as set forth in the "Right to Counsel" section of the Declaration of James D. Riddet in Support of Defendants' Joint Motion to Dismiss Indictment.

It has been six months since the WHO declared a global pandemic, and MDC still has not come up with a system that permits defense counsel to have regular, confidential meetings with detained clients and share documents with them remotely.  Particularly in case such as this, where discovery is voluminous, this failure has prejudiced Ms. Cabactulan by preventing her from consulting with counsel and assisting in preparing her defense.  *See United States v. Resendiz-Guevara*, 145 F. Supp. 3d 1128, 1139 (M.D. Fla. 2015) (finding defendant's constitutional violations resulted in prejudice by preventing him "from consulting with his counsel, preparing a defense, appearing at his trial to face the charges or appearing as a witness, and otherwise preparing a defense").  If the government's failure to provide her meaningful access to counsel interferes with this Court's ability to try her fairly, Ms. Cabactulan should not have to be the one who pays the price.  The Court should dismiss the indictment pursuant to its supervisory powers.

*See Trujillo-Alvarez*, 900 F. Supp. 2d at 1180-81 (where defendant's detention is preventing his access to counsel, indictment must be dismissed with prejudice unless defendant is released on bond); *see also United States v. Munoz-Garcia*, No. CR-19-01670-TUC-JGZ, 2020 WL 1929204, at \*3 (D. Ariz. Apr. 21, 2020) (dismissing indictment with prejudice and finding that, as a result of the Executive Branch's operation, defendant was deported and disadvantaged in preparing a defense in her criminal case, and the court's ability to fairly try her was jeopardized); *United States v. Lutz*, No. CR1900692001TUCRMBGM, 2019 WL 5892827, at \*5 (D. Ariz. Nov. 12, 2019) (dismissing indictment with prejudice based on violation of right to counsel and "in order to promote respect for the BRA and to deter ICE and the U.S. Attorney's Office from continuing to engage in turf battles in lieu of interagency cooperation").

## VI.   CONCLUSION

For the foregoing reasons, defendant Cabactulan respectfully requests that the Court dismiss the Indictment.

DATED:  September 21, 2020

Gary S. Lincenberg
Naeun Rim
Kate S. Shin
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:  _____*/s/ Naeun Rim*_____
        Naeun Rim
        Attorneys for Defendant Guia Cabactulan

3669298

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT

DATED:  September 21, 2020          Thomas H. Bienert, Jr.
                                   James D. Riddet
                                   Gerloni S. Cotton
                                   BIENERT | KATZMAN, PC



                                   By:  _____/s/ James S. Riddet_____
                                            Thomas H. Bienert, Jr.
                                       Attorneys for Defendant Marissa Duenas

DATED:  September 21, 2020          Mark A. Byrne
                                   BYRNE & NIXON LLP



                                   By:  _____/s/ Mark A. Byrne_____
                                            Mark A. Byrne
                                       Attorney for Defendant Amanda Estopare

     *Pursuant to Local Rule 5-4.3.4(2), the filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

3669298

51

DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT